933 A.2d 11 (2007)
396 N.J. Super. 109
STATE of New Jersey, Plaintiff-Respondent
v.
David L. MOON, a/k/a David L. Hyde, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 18, 2007.
Decided October 9, 2007.
*12 Yvonne Smith Segars, Public Defender, for appellant (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the brief).
Joshua M. Ottenberg, Acting Camden County Prosecutor, for respondent (Nancy P. Scharff, Acting Assistant Prosecutor, of counsel and on the brief).
Before Judges COBURN, FUENTES and GRALL.
The opinion of the court was delivered by
GRALL, J.A.D.
Defendant David L. Moon appeals from a final judgment of conviction and sentence. A jury found him guilty of purposeful or knowing murder, N.J.S.A. 2C:11-3a(1); endangering an injured victim, N.J.S.A. 2C:12-1.2; possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a; unlawful possession of a firearm, N.J.S.A. 2C:39-5b; and hindering his own apprehension, N.J.S.A. 2C:29-3b(1). He was acquitted of felony murder, robbery and one count of hindering apprehension, and the jury found that he did not act in the heat of passion resulting from reasonable provocation. We reverse defendant's conviction for endangering an injured victim but affirm all other convictions. The sentence imposed and our reasons for remanding for clarification of that sentence are discussed in section III of this opinion.
Corie Carter died as a consequence of a gunshot wound to his head. Within hours of the shooting, defendant was arrested. He admitted that he had fired the fatal shot and explained why. The following description of the events is based on defendant's statement and the trial testimony given by Willie Carter (Carter) and John Martinez (Martinez), who were with defendant and Corie. Defendant did not testify, but the jurors heard a recording of the statement he gave to the police.
Defendant, Corie, Carter and Martinez spent the evening and early-morning hours of February 22 and 23, 2003, in a fenced and gated lot in Camden where Martinez kept his trailer home. The men were reminiscing about a friend who had recently died, talking and "rapping." Others joined them during the course of the night. Everyone was drinking, but Carter did not notice anyone who was drunk and was not aware of anyone smoking marijuana.
After the others left the lot and Martinez was in his trailer, defendant and Corie got into a debate about "God" and the "well-being of human beings." The debating turned to quarreling, and they stood "face to face." Carter stepped between them three times. On his third attempt to calm them down, he noticed a gun in Corie's hand and stepped away. Corie fired the gun three or four times. Defendant, who had turned away from Corie, felt the bullets "whiz past" him. Carter saw the "sparks" from Corie's gun and saw defendant check himself to see if he was shot. Defendant was not hit. Martinez had heard loud voices and a popping sound from inside the trailer. When he came outside, he saw Corie with a gun in his hand. Corie put the gun away, and Martinez went back inside.
To Carter, after Corie fired his gun, defendant appeared as if he were in shock but did not seem angry. Defendant *13 stayed and talked for about ten or fifteen minutes after the shooting.
Defendant gave a detailed account of his conversation with Corie. They agreed that things were "straight" between them and shook hands. Then Corie handed defendant his gun and said, "shoot me." Defendant was "shocked" by that statement and gave the gun back to Corie, who laughed and offered defendant something to eat. Defendant ate some rice but afterwards felt "freaked out" by what had happened. He left to take a walk. Martinez heard defendant say he would be back.
Defendant returned and spoke to Corie. Carter could not hear what they were saying but assumed everything was alright because they were talking in a friendly way. He thought defendant was trying to make Corie feel "comfortable."
Defendant explained that he came back to "make sure that everything was okay" between him and Corie. He walked up to Corie, asked if they were "cool," and gave him a hug and kiss. Corie warned defendant that if he told anyone what had happened, he would kill him. Defendant described his reaction: "When [Corie] told me he was going to kill me, I just snapped, not really snapped, I just took out the, the gun I had that was in my pocket. . . . I . . . pulled the trigger. The body dropped."
Carter heard the shot and saw Corie fall to the ground. According to Carter, after defendant shot Corie, he said "don't nobody be shooting at me." Defendant closed and locked the gate to the lot. Carter saw him drag and kick the body. Because defendant removed Corie's gun, Carter assumed defendant was looking for the gun when he kicked Corie. Martinez, who heard the shot and Carter yelling, came outside again. He saw defendant with two guns. Corie was in a "sitting position" near a truck on the lot. Martinez did not realize that Corie had been shot until defendant pushed him with his foot and Corie "slumped over" into the snow and did not move.
Corie's body was moved to the street. According to Martinez, he unlocked the gate but refused to help defendant. According to defendant, Martinez told him to move the body off his lot, gave him a hand truck and helped.
Carter, who left when Martinez unlocked the gate, went to his mother's home. She called a relative whose husband is a homicide detective. Carter took the police to the lot, and Carter and Martinez left with the police. As they traveled to headquarters, Carter spotted defendant. He was arrested and gave his statement.
When asked about the guns, defendant said he had sold Corie's gun and thrown his own gun away near a factory between Second and Third Streets. He explained his lack of certainty about where he threw his gun: "Everything was going crazy man, you know, I ain't going to lie. I was smoking a little wet, you know some PCP so ahh, my vision was like jumpy, and I was just like wow, wow, wow . . . when I touched the gun. . . ."
The investigating officers found Corie's body about seventy-five yards from the gate outside Martinez's lot. There was blood on the ground. Inside the lot, they found one "quart bottle of King Cobra Premium Malt," one twelve-ounce can of beer and what appeared to be a burned marijuana cigarette. They also found containers of Chinese food.
Although the police did not find the gun where defendant said he had discarded it, he subsequently admitted that he had hidden it under a couch in his uncle's home. The police recovered the gun from that spot.
*14 An autopsy was performed within hours of Corie's death. The bullet entered his head just above and behind his right ear. It traveled across his head and through both halves of his brain. From the condition of Corie's clothing and the appearance of his wound, the medical examiner concluded that the gun was held to Corie's head when the shot was fired.
In the opinion of the medical examiner, the extensive damage to Corie's brain would have incapacitated him instantly, and he was dead or dying when his face hit the ground. Corie had an abrasion under his ear and a "substantial split" inside his mouth where his lip and cheek hit his teeth. Neither injury showed any of the swelling, bruising or bleeding that would be present if his blood were circulating at the time of the impact. In the medical examiner's words, these were "terminal collapse" injuries. While Corie's heart could have continued to beat "erratically" for a few minutes after he was shot and a pulse could have been detected for a short time, "[t]o all intents and purposes, he was dead" when shot. His heart could not continue to beat without his brain.
The doctor was not asked about and did not mention the blood on the ground under Corie's body.
Corie's blood had an alcohol content of .096. There were traces of marijuana and PCP in his urine, but not in his blood. In the opinion of the medical examiner, the trace evidence of the drugs was indicative of consumption up to two or three days before his death.
Defendant raises the following arguments on appeal.
I. THE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE IN DENYING A REQUESTED CHARGE AS TO VOLUNTARY INTOXICATION.
II. THE TRIAL COURT ERRED IN DECLINING TO GRANT A MISTRIAL FOLLOWING THREE HIGHLY PREJUDICIAL IMPROPRIETIES.
A. The Prosecutor Expressed Personal Opinion Of Guilt In Her Opening.
B. The State Twice Elicited Highly Prejudicial Evidence As To A "Mugshot" Of The Defendant, And The Trial Court's Response Was Grossly Inadequate.
III. THE CONVICTION OF ENDANGERING AN INJURED VICTIM WAS UNSUPPORTED BY COMPETENT FACTS IN THE RECORD.
IV. THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE.
A. The Quantum Of The Sentence Is Excessive.
B. The Court Erred In Imposing Consecutive Sentences.

I
The issue raised in Point III of defendant's brief requires us to consider the elements of endangering an injured victim as defined in N.J.S.A. 2C:12-1.2. The adequacy of the State's evidence of this crime must be assessed with reference to its elements. See State v. Samuels, 189 N.J. 236, 244-46, 914 A.2d 1250 (2007). The State's evidence, viewed favorably to the State and with the benefit of all reasonable inferences, must be adequate to permit the jurors to find each element of the crime beyond a reasonable doubt. Ibid.
"A person is guilty of endangering an injured victim if he causes bodily injury to any person . . . and leaves the scene of the injury knowing or reasonably believing that the injured person is physically helpless, *15 mentally incapacitated or otherwise unable to care for himself." N.J.S.A. 2C:12-1.2a. Physically helpless "means the condition in which a person is unconscious, unable to flee, or physically unable to summon assistance." N.J.S.A. 2C:12-1.2b(1). Mentally incapacitated "means that condition in which a person is rendered temporarily or permanently incapable of understanding or controlling one's conduct, or of appraising or controlling one's condition, which incapacity shall include but is not limited to an inability to comprehend one's own peril." N.J.S.A. 2C:12-1.2b(2). Thus, the State must establish that defendant caused bodily injury to the victim, that the victim was sufficiently helpless, incapacitated or unable, and that the defendant left the victim at the scene of the injury knowing (being aware, N.J.S.A. 2C:2-2b(2)) or reasonably believing (disregarding or failing to perceive a risk that a reasonable person would perceive, N.J.S.A. 2C:2-2b(3)) that the victim was in that condition. See N.J.S.A. 2C:1-14j ("ZD `Reasonably believes' or `reasonable belief' designates a belief the holding of which does not make the actor reckless or criminally negligent").
The evidence in this case requires us to consider whether the State must prove that the victim was helpless, incapacitated or unable for reasons other than death. There was no evidence that Corie exhibited any sign of life after he was shot or that defendant or anyone else present knew or reasonably believed that he was alive and incapacitated, helpless or unable after he collapsed. In the medical examiner's opinion, Corie was dead or dying as soon as he was shot. An erratic heartbeat could have been detected for a few minutes, but there was no evidence that anyone checked his pulse. Further, by the time Corie was moved to the street more than a few minutes had passed. Defendant had locked the gate, removed Corie's gun from his body, possibly propped Corie in a sitting position near a truck in the lot, spoken to Carter and Martinez, and either dragged Corie with no help or moved him with the help of Martinez from the lot to a spot seventy-five yards from its gate. Thus, no juror could reasonably find that Corie was alive and helpless, incapacitated or unable at the relevant time  when defendant left him on the street  or that defendant knew or reasonably believed that he was alive.
The crime cannot be construed to apply to a person who kills another and leaves the body behind. While, quite literally, a person who is dead is unconscious and helpless and lacks all capacity and ability, we must construe "the provisions of the code . . . according to the fair import of their terms. . . ." N.J.S.A. 2C:1-2c. The statutory terms used to define the condition of the victim  unconscious, unable, helpless and incapacitated  are not commonly used to describe the condition of persons who are dead. That is not the "fair import" of those terms.
Even if we were to conclude that terms such as unconscious, unable, helpless and incapacitated are susceptible of a construction that includes the deceased, we must consider whether that construction would further the general principles of the code. N.J.S.A. 2C:1-2c. One major purpose is "to give fair warning of the nature of the conduct proscribed." N.J.S.A. 2C:1-2a(4), c. The statute gives no fair warning that one who leaves the body of a homicide victim commits this crime.
In determining whether the Legislature intended this crime to prohibit abandonment of a corpse, we must also consider the "special purposes" of the provision. N.J.S.A. 2C:1-2c. In State v. Jones, 308 N.J.Super. 174, 188-90, 705 A.2d 805 (App. Div.), certif. denied, 156 N.J. 380, 718 A.2d 1209 (1998), we were required to decide whether a defendant could be convicted of *16 sexual assault without proof that the victim was alive at the time of penetration. Noting that the Code's definition of "person" did not resolve the issue, we considered "the principles that undergird our sex offense law." Id. at 189, 705 A.2d 805.[1] Because New Jersey's sexual assault crimes focus "more on the assaultive behavior than the sexual act," we concluded that when a sexual assault is committed as part of one "continuous transaction" and the State establishes that the victim was alive at the time the assault commenced, the State need not prove that the victim was still alive at the time of penetration. Id. at 189-90, 705 A.2d 805.
The obvious focus of this endangering statute is minimizing the risk of additional harm to an injured victim who is in need of assistance by criminalizing the act of leaving a person helpless, incapacitated or unable after causing bodily injury.[2] That purpose is evinced by the definition of the crime and the "affirmative defense" that is available to a person who protects the victim from further injury and summons assistance. N.J.S.A. 2C:12-1.2c. It would be absurd to extend this crime beyond the ordinary meaning of its terms to reach those who leave a person who has died. Any alternate, additional or secondary purposes we can posit  for example, facilitating apprehension of those who inflict bodily injury by requiring them to remain at the scene of their crimes or preventing abuse of corpses by passersby  are addressed by other crimes. See, e.g., N.J.S.A. 2C:22-1 to -2; N.J.S.A. 2C:29-3.
We hold that the State must introduce evidence that would permit the jurors to find that the victim was alive and "physically helpless, mentally incapacitated or otherwise unable to care for himself" and that the defendant left the scene of the injury knowing or reasonably believing that the victim was in that condition. The evidence in this case, viewed most favorably to the State and with the benefit of all reasonable inferences, was inadequate to permit the jury to find that Corie was in that condition or that defendant left him on the street knowing or reasonably believing that he was anything other than dead. Accordingly, the conviction is reversed and the charge is dismissed.
[At the court's discretion, its recitation and discussion of Sections II and III have been omitted from the published opinion.]
Defendant's conviction for endangering an injured victim, N.J.S.A. 2C:12-1.2, is reversed and the charge is dismissed; all other convictions are affirmed; the matter is remanded for clarification of the sentence and amendment of the judgment of conviction.
NOTES
[1] "Person" is simply defined to "include any natural person and, where relevant, a corporation or an unincorporated association." N.J.S.A. 2C:1-14g.
[2] The legislative history is not informative. See N.J. Assembly Committee, Statement to Second Reprint, S. 968 (October 16, 2000); Sponsor's Statement to S. 968 (February 10, 2000).