120 A.3d 170

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
ELISE N. MUNAFO, DEFENDANT–APPELLANT.

Argued March 17, 2015—Decided August 5, 2015.

*Monique D. Moyse,* Designated Counsel, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Joseph A. Glyn,* Deputy Attorney General, argued the cause for respondent (*John J. Hoffman,* Acting Attorney General of New Jersey, attorney).

Chief Justice RABNER delivered the opinion of the Court.

After a fight at a club in Newark, defendant Elise Munafo ran over someone with a car and fled the scene. A jury convicted defendant of endangering a helpless victim, in violation of *N.J.S.A.* 2C:12–1.2.

On appeal, defendant argued that the statute requires proof that a defendant's flight increased the risk that further harm would come to the injured victim. Like the Appellate Division, we conclude that the statute does not include that element. We therefore affirm.

## I.

The facts are taken from the record of defendant's jury trial. On March 1, 2009, Erica Ortiz and a few friends went to the XL Lounge, a dance club in Newark, where they socialized and had drinks. Defendant and her boyfriend, Oscar Rodriguez, went to the club that night as well. Defendant and Ortiz had never met before.

At about 1:35 a.m., Ortiz was in the bathroom with a friend, Jessica Machado, when defendant entered the restroom escorted by Rodriguez. He guided defendant to a stall, while speaking to her, and then left the bathroom. Ortiz heard Rodriguez's voice and called out from another stall to ask Machado whether a man was in the bathroom. Soon after, defendant got into a fight with Ortiz and Machado about whether the women were talking about her boyfriend. A security guard broke up the fight and escorted defendant and Rodriguez out of the club.

Ortiz left the club at closing time, around 3:00 a.m., with two friends, Christina Gratacos and Nihar Patel. As the three walked to Patel's car, defendant and Rodriguez drove up to Ortiz and her

friends. Defendant confirmed, "that's the girl"; Rodriguez jumped out of the car; and Rodriguez punched Ortiz in the face and reignited the fight. Patel, who stepped in to help Ortiz, fought with Rodriguez. Meanwhile, defendant left the car and fought with Ortiz again. At one point, Rodriguez kicked Ortiz in the ribs.

Bystanders eventually intervened and broke up the fight. Defendant and Rodriguez then got back in their car, and Rodriguez drove off. Minutes later, they returned and double-parked outside the club. Rodriguez got out of the driver's side of the car and began to fight with Patel again; others also joined in the fight.

Ortiz was not involved in this part of the brawl. From the sidewalk, she saw a jacket on the ground that she thought belonged to Patel. She went to pick up the jacket, which was in front of defendant's car. At that moment, defendant moved from the passenger's to the driver's seat. Ortiz testified that when she stood up with the jacket, defendant looked straight at her, put the car into gear, turned the wheel, and drove into Ortiz.

The car's front tire ran over Ortiz, who became lodged under the car and was dragged about fifty feet. Patel and others banged on the car to get defendant to stop, but she did not. When defendant turned a corner, the back tire ran over Ortiz, who was dislodged from the car. Defendant drove off.

Ortiz's friends and some bystanders surrounded her to offer help and called for an ambulance. Because Ortiz's clothes had ripped off while she was dragged through the street, a number of people put jackets over her to protect her from the cold.

Ortiz had a number of injuries including a shattered pelvis, a dislocated hip, a ruptured bladder, significant bruising to her lung, injuries to both of her eyes, scarring, and road rash. She spent twenty days in the hospital, underwent multiple surgeries and radiation treatment, spent about two weeks at an in-patient rehabilitation facility, and had additional out-patient treatment and physical therapy through September 2009. A treating physician

from the University of Medicine and Dentistry of New Jersey testified that had Ortiz not been treated for her injuries, she could have died.

The police investigated the assault and, based on an anonymous tip, tried to find defendant at her workplace. On March 11, 2009, defendant voluntarily went to a Newark police station with an attorney and gave a recorded statement. She described the events at the club and stated that she fled the scene of the fight because she was scared. She claimed that she did not realize she had hit anyone. Defendant also stated that she and Rodriguez sold the car several days after the incident. The police tried to locate the car, but it had been sold a second time. The State played defendant's statement for the jury; defendant did not testify.

A grand jury in Essex County returned an indictment that charged defendant with first-degree attempted murder, *N.J.S.A.* 2C:5–1 and *N.J.S.A.* 2C:11–3 (count one); second- and third-degree aggravated assault, *N.J.S.A.* 2C:12–1(b)(1) and *N.J.S.A.* 2C:12–1(b)(2) (counts two and five); third-degree possession of a weapon (the car) for an unlawful purpose, *N.J.S.A.* 2C:39–4(d) (count four); fourth-degree aggravated assault by automobile, *N.J.S.A.* 2C:12–1(c) (count six); third-degree endangering an injured victim, *N.J.S.A.* 2C:12–1.2 (count seven); and fourth-degree obstructing the administration of law, *N.J.S.A.* 2C:29–1 (count eight). Prior to trial, the State dismissed an additional count: fourth-degree unlawful possession of a weapon (the car) (count three).

The trial began on June 30, 2010, and continued over the course of about two weeks. Toward the end of the trial, defense counsel submitted a proposed jury charge to the court. It is not part of the record. The trial judge later gave counsel the court's draft jury instructions to evaluate over the weekend.

At the charge conference the following week, the court and counsel reviewed certain standard instructions and then turned to specific instructions about the offenses in the indictment. With regard to the endangering charge, the court explained that it

would "read the entire statute, and then read the elements." The court then tailored the charge to the facts of the case-and both counsel agreed with the court's changes.[1]

Before the jury, the judge read both the endangering count in the indictment and the abridged version of the statute, and then tracked the model jury charge, as modified:

> To find Miss Munafo guilty of endangering an injured person, the State must prove beyond a reasonable doubt each of the following elements. One, that she caused bodily injury to another. Two, that the injured person was physically helpless or otherwise unable to care for herself, and three that she left the scene of the injury knowing or reasonably believing the injured person was physically helpless or otherwise unable to care for herself.

*See Model Jury Charge* (Criminal), "Endangering Injured Victim (*N.J.S.A.* 2C:12–1.2)" (Apr. 18, 2005). The court then expanded upon the above elements and defined certain terms, once again relying on the model jury charge.

Defense counsel did not object to the charge. After reading it in full, the trial court invited counsel to sidebar and asked them if anything had been omitted. Defense counsel did not comment in response.

The jury acquitted defendant of attempted murder, found her guilty of the lesser-included offense of fourth-degree aggravated assault by recklessly causing bodily injury with a deadly weapon (on count five), and found her guilty of all the remaining charges.

After the court merged certain counts and ran others concurrently, the judge imposed a five-year term of imprisonment for second-degree aggravated assault, subject to the No Early Re-

---

[1] Both counsel agreed that the court did not need to read or discuss the underscored parts of the statute with the jury:

> A person is guilty of endangering an injured victim if he causes bodily injury to any person or solicits, aids, encourages, or attempts or agrees to aid another, who causes bodily injury to any person, and leaves the scene of the injury knowing or reasonably believing that the injured person is physically helpless, mentally incapacitated or otherwise unable to care for himself. [*N.J.S.A.* 2C:12–1.2(a) (emphasis added).]

lease Act, *N.J.S.A.* 2C:43–7.2, and a consecutive term of three years' imprisonment for the endangering conviction.

Defendant appealed. For the first time, she argued that the judge omitted an element of the offense for endangering: that a defendant's flight increased the risk of further harm to the victim. Defendant also raised certain other issues that are not part of this appeal.

The Appellate Division disagreed with defendant's claim about the endangering count. The panel concluded that the jury charge complied with the law and fully recited the three statutory elements of the offense. The panel found no fourth element under the statute and rejected defendant's reliance on language from an unpublished opinion. The Appellate Division also found sufficient evidence to support the endangering conviction.

We granted defendant's petition for certification, which challenges the endangering charge. 219 *N.J.* 631, 99 *A.*3d 835 (2014).

## II.

Defendant presents a focused argument—that the crime of endangering an injured victim includes as an element "that a defendant's flight from the scene of the injury increased the risk that further harm would come to the victim left in a vulnerable state, or that the victim's condition would further deteriorate." Defendant contends that both the plain language of the statute and extrinsic sources require the State to prove that additional element. Because the trial court did not instruct the jury accordingly, defendant argues that her conviction for endangering must be reversed.

The State maintains that defendant's conviction for endangering should stand. The State initially asserts that defendant waived any challenge to the jury charge and invited any alleged error. The State also argues that the trial court properly charged the jury on the endangering count. The State contends that the plain language of the statute focuses on defendant's conduct and state of

mind, as well as the victim's injuries at the time of flight, and not the risk of increased harm because of a defendant's flight. The State submits that defendant's interpretation would nullify the statute's affirmative defense. In addition, the State asserts that the legislative history supports its reading of the endangering law.

### III.

The State argues that the invited error doctrine applies because defense counsel participated in the charge conference and did not object to the proposed charge at the end of the conference.

Under the invited error doctrine, "trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" *State v. A.R.*, 213 *N.J.* 542, 561, 65 *A.*3d 818 (2013) (quoting *State v. Corsaro*, 107 *N.J.* 339, 345, 526 *A.*2d 1046 (1987)). That principle of law gives voice to "the common-sense notion that a 'disappointed litigant' cannot argue on appeal that a prior ruling was erroneous 'when that party urged the lower court to adopt the proposition now alleged to be error.'" *Ibid.* (quoting *N.J. Div. of Youth & Family Servs. v. M.C. III*, 201 *N.J.* 328, 340, 990 *A.*2d 1097 (2010)).

Based on the record before the Court, it appears that defense counsel consented to the trial court's use of the model jury charge on endangering, with slight modifications. Although counsel presented a proposed charge to the court, there is no copy of it in the record. As a result, we cannot tell if defense counsel asked for a particular charge, if the court relied on counsel's request, and if defendant has now chosen to challenge that decision on appeal. *See State v. Jenkins*, 178 *N.J.* 347, 358–60, 840 *A.*2d 242 (2004) (finding no invited error when trial court did not actually rely on defendant's request not to give specific charge). In other words, we cannot determine from the record that counsel "invited" any error. We therefore examine defendant's arguments on the merits.

## IV.

Because defendant did not object to the jury charge, we review the instruction for plain error. *State v. Camacho*, 218 *N.J.* 533, 554, 95 *A.*3d 635 (2014). Under that standard, we consider whether defendant's claim of error was "clearly capable of producing an unjust result." *R.* 2:10–2.

### A.

This is a case of statutory interpretation. Our task therefore "is to discern and give effect" to the Legislature's intent. *State v. O'Driscoll*, 215 *N.J.* 461, 474, 73 *A.*3d 496 (2013). To begin, we look at the plain language of the statute. *See State v. Frye*, 217 *N.J.* 566, 575, 90 *A.*3d 1281 (2014); *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). If the language is unclear, courts can turn to extrinsic evidence for guidance, including a law's legislative history. *Morristown Assocs. v. Grant Oil Co.*, 220 *N.J.* 360, 383, 106 *A.*3d 1176 (2015). But a court may not rewrite a statute or add language that the Legislature omitted. *DiProspero, supra*, 183 *N.J.* at 492, 874 *A.*2d 1039 (citations omitted).

### B.

We repeat the language of the endangering statute for convenience. It provides in part that

[a] person is guilty of endangering an injured victim if he causes bodily injury to any person or solicits, aids, encourages, or attempts or agrees to aid another, who causes bodily injury to any person, and leaves the scene of the injury knowing or reasonably believing that the injured person is physically helpless, mentally incapacitated or otherwise unable to care for himself.

[*N.J.S.A.* 2C:12–1.2(a).]

The statute, as applied to this case, has three elements: (1) that defendant knowingly caused bodily injury to any person; (2) that the injured person was physically helpless, mentally incapacitated, or otherwise unable to care for herself; and (3) that the defendant left the scene of the injury knowing or reasonably believing that

the injured person was in that condition. We rely on the gap-filler provision at *N.J.S.A.* 2C:2–2(c) to add the mental state of "knowingly" to the first element. *See N.J.S.A.* 2C:2–2(c)(1) ("When the law defining an offense prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears.").

The statute also provides a defense: "It is an affirmative defense to prosecution for a violation of this section that the defendant summoned medical treatment for the victim or knew that medical treatment had been summoned by another person, and protected the victim from further injury or harm until emergency assistance personnel arrived." *N.J.S.A.* 2C:12–1.2(c). Defendant must prove the defense by a preponderance of the evidence. *Ibid.*

The Appellate Division in *State v. Moon,* 396 *N.J.Super.* 109, 116, 933 *A.*2d 11 (App.Div.2007), concluded that the law cannot apply to someone "who kills another and leaves the body behind." The panel explained that it would contradict the "fair import" of the terms of the statute—"unable," "helpless," and "incapacitated," which typically refer to a living person—to apply the law to a situation when the victim has already died. *Ibid.*

In dicta that defendant seizes upon, the Appellate Division also observed that "[t]he obvious focus of this endangering statute is minimizing the risk of additional harm to an injured victim who is in need of assistance." *Id.* at 117, 933 *A.*2d 11. In light of that purpose, the panel reasoned that it would not serve the law's goals "to extend th[e] crime ... to reach those who leave a person who has died." *Ibid.*

## C.

Defendant argues that there is an additional element to the statute. She contends that the State must also prove that a defendant's "flight from the scene of the injury increased the risk

that *further* harm would come to the victim left in a vulnerable state, or that the victim's condition would further deteriorate."

We do not agree. To begin with, the language of the statute does not include the element defendant suggests. Nor is it implicit in the statute that a defendant's flight must enhance the risk of further injury. The Legislature, instead, chose to criminalize the act of leaving the scene of an injury with knowledge that the victim was helpless. That behavior, in itself, presents the risk of further injury. Indeed, whenever a person leaves a victim in a helpless state, there is an inherent risk of additional harm to the victim. But nothing in the statute suggests that the Legislature required a showing of increased risk of further injury. Like other laws, the statute addresses conduct that presents a potential risk of harm or additional injury but does not require separate proof of an increased risk. *See, e.g., N.J.S.A.* 2C:5–1 (criminal attempt); *N.J.S.A.* 2C:5–2 (conspiracy); *N.J.S.A.* 2C:11–5.2 (leaving scene of boating accident that resulted in serious bodily injury to another); *N.J.S.A.* 2C:12–1.1 (leaving scene of motor vehicle accident that resulted in serious bodily injury to another); *N.J.S.A.* 2C:12–1.3 (failure to report missing child).

The endangering statute "seems to have been suggested by 2C:12–1.1." Cannel, *New Jersey Criminal Code Annotated,* comment on *N.J.S.A.* 2C:12–1.2 (2014–15). That law punishes the act of leaving the scene of an accident that injured a victim but also does not require proof that the defendant's flight increased the risk of future harm.

This is not a case, as defendant suggests, in which "the words of the statute alone . . . without any further explanation would not fully convey to the jury the nature of the actual elements of the conduct that the Legislature intended to criminalize." *State v. Alexander,* 136 *N.J.* 563, 571, 643 *A.2d* 996 (1994) (interpreting drug kingpin statute). The language in the statute is clear, and it plainly communicates the Legislature's intent.

Defendant in effect asks the Court to rewrite the law and add an element that the Legislature did not include. But the Legisla-

ture was free to decide that liability under the endangering statute should not depend on whether, after a defendant fled, a good Samaritan arrived and helped a victim or an indifferent bystander looked the other way and the victim's condition worsened.

The additional element that defendant urges is also at odds with the statute's affirmative defense. To avail themselves of the defense, defendants must show that they "summoned medical treatment for the victim or knew that medical treatment had been summoned by another person, and protected the victim from further injury or harm until emergency assistance personnel arrived." *N.J.S.A.* 2C:12–1.2(c). The defense goes to the statute's core aim: it gives defendants an incentive to stay after causing injury in order to minimize the inherent risk of further harm to the victim.

As the State argues, the Legislature anticipated that a victim might suffer further harm because of the defendant's flight. Rather than require the State to prove additional harm as a fourth element, the statute instead places the burden on defendants to show they took steps to prevent that harm to the victim.

In practice, if defendant's fourth element were added to the statute, the affirmative defense would be meaningless. On the one hand, if the State could not prove the extra element, a defendant would not be guilty and would not need to present evidence to support the affirmative defense. On the other hand, if the State could prove the extra element—and show an increased risk of harm to an injured victim because of a defendant's flight— it is hard to imagine how the defendant could satisfy the affirmative defense and prove that he or she protected the victim from further harm. Courts should avoid construing a statute in a way that renders a provision meaningless. *Paper Mill Playhouse v. Millburn Twp.*, 95 *N.J.* 503, 521, 472 *A.*2d 517 (1984).

Because the language of the statute is clear, we need not examine extrinsic sources. *State v. Lenihan*, 219 *N.J.* 251, 262, 98 *A.*3d 533 (2014). Nonetheless, we have not found support for defendant's position in the legislative history. As the Appellate

Division observed in *Moon, supra,* and as defendant concedes, "[t]he legislative history is not informative." 396 *N.J.Super.* at 117 n. 2, 933 *A.*2d 11. It does little more than track the plain language of the statute and does not suggest that the Legislature intended any additional elements. *See S.* 968 (Sponsor's Statement), 209th Leg. (Feb. 10, 2000); *Assemb. Judiciary Comm. Statement to S. No. 968,* 209th Leg. (Oct. 16, 2000).

■ Defendant also argues that the statute's caption, "Endangering an Injured Victim," reveals that the purpose of the law "is to criminalize the risk of additional harm by flight." A statute's title, though, cannot control over the clear words of a law. *See State v. Cannon,* 128 *N.J.* 546, 557 n. 7, 608 *A.*2d 341 (1992) (citing *Cameron & Cameron Inc. v. Planning Bd.,* 250 *N.J.Super.* 296, 302, 593 *A.*2d 1250 (App.Div.1991)); *see also Swede v. City of Clifton,* 39 *N.J.Super.* 366, 377–78, 121 *A.*2d 43 (App.Div.) ("Although the title of an act will be recognized as casting some light upon the meaning of legislation, it is not to be used to expand or enlarge upon the plain meaning of the language employed." (internal citation omitted)), *aff'd,* 22 *N.J.* 303, 125 *A.*2d 865 (1956). "[A] title may not be used to create ambiguity when the body of the act itself is clear." Norman J. Singer & Shambie Singer, 2A *Sutherland Statutory Construction* § 47:3 at 290–91 (7th ed. 2014).

In addition, defendant claims that other statutes address either flight or bodily injury alone; she points to *N.J.S.A.* 2C:29–1(a) (obstructing administration of law (through flight)) and *N.J.S.A.* 2C:12–1 (assault). Defendant also notes that the crime of obstruction carries a lesser penalty than the endangering statute. Defendant therefore asserts that the endangering law must require proof of something more—an increased risk of additional injury.

But the endangering statute encompasses more than just flight or bodily injury alone. The law makes it an offense to cause bodily injury *and* flee the scene *with* knowledge or a reasonable belief that the injured person was in a vulnerable state. The crime of endangering thus has distinct elements that go beyond

either obstruction or assault, and a correspondingly greater penalty.

When the Legislature enacted the endangering statute, it chose to punish a defendant's knowing behavior—leaving the scene under circumstances that might well lead to greater harm to a victim—but did not require a showing of increased risk of further harm. Because the jury charge tracked the statute as written, it was not error to omit the element defendant now requests.[2]

## V.

For the reasons stated above, we affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ–VINA, SOLOMON, and Judge CUFF (temporarily assigned)—7.

*Opposed*—None.

---

[2] We do not reach certain additional arguments that defendant raises because they evidently lack merit. One relies on an unpublished opinion. *See R.* 1:36–3. Another claims that there is insufficient evidence to support the fourth element. Finally, because the statute is not ambiguous, the rule of lenity plays no role in this case. *State v. Olivero,* 221 *N.J.* 632, 639–40, 115 *A.*3d 1270 (2015).