**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1627-18T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAMES A. STUART,

      Defendant-Appellant.

_____

Submitted January 28, 2020 – Decided March 2, 2020

Before Judges Accurso and Gilson.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 13-09-0949.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Charles A. Fiore, Gloucester County Prosecutor, attorney for respondent (Dana R. Anton, Senior Assistant Prosecutor, on the brief).

PER CURIAM

David Compton was shot in the head while at the home of defendant James Stuart. Compton later died from the gunshot wounds. Defendant has never disputed that he shot Compton. The issue is whether the shooting was intentional, reckless, or a tragic accident.

Defendant has been tried twice for the shooting of Compton. Following his first conviction for murder and aggravated manslaughter, we reversed and remanded for a new trial because of errors in the jury charge. State v. Stuart, No. A-3262-15 (App. Div. Aug. 3, 2017).

A second jury convicted defendant of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), as a lesser-included offense of first-degree murder, N.J.S.A. 2C:11-3(a)(2). Defendant was sentenced to seven years in prison with periods of parole ineligibility and parole supervision following his release from prison, as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant now appeals his second conviction, contending there were errors at his second trial that warranted a reversal of his conviction and the sentence was excessive. We affirm his conviction. We remand for resentencing so that the court can rebalance the aggravating and mitigating factors without considering aggravating factor one. We also remand so the court can consider

whether defendant should be disqualified from all future state employment in addition to his forfeiture of past state employment.

I.

We derive the facts from the testimony and evidence presented at the second trial. In 2013, defendant was a Deptford Township police officer.

On January 4, 2013, defendant, while off duty, went out to a bar with a group of friends. Compton was one of those friends. Defendant and his friends drank various alcoholic beverages together for several hours. Compton and defendant then went to defendant's home where they continued to drink and watched a movie. While watching the movie, defendant removed a Glock 27 handgun from his ankle holster. As a police officer, defendant was required to carry a gun, even when off duty except when doing so would be impracticable. The Glock 27 was defendant's department-approved off-duty handgun.

According to defendant, Compton asked to see the gun. Defendant testified at trial that he made the weapon safe by removing the magazine and placing the round that had been in the chamber on a table. Defendant next dry fired the gun and then allowed Compton to handle the weapon. Defendant also retrieved two other guns – his service weapon, a Glock 22, and a revolver – from a gun safe and showed those weapons to Compton.

3

According to defendant, he thereafter fell asleep while watching the movie. Sometime later, defendant claims he woke up suddenly when he was startled by a loud scene in the movie. Defendant picked up the Glock 27 intending, according to defendant, to dry fire it at the movie screen. Compton, however, was shot in the head.

At approximately 5 a.m. on January 5, 2013, defendant called an emergency dispatcher at the Gloucester County Communication Center and reported that Compton had been shot. Several Deptford police officers responded to defendant's home. They found Compton slumped over on the couch, still alive, but with a bullet hole in his cheek. Two responding officers testified that defendant appeared to be in a state of shock and that he was taken to the backyard.

The officer who accompanied defendant to the backyard testified that defendant was walking and talking slowly, smelled of alcohol, and appeared to be intoxicated. That officer also testified that he heard defendant call his union representative and leave him a message.

Compton was transported to a hospital. A trauma surgeon who treated Compton testified that the gunshot fractured Compton's first cervical vertebra and injured one of the arteries that provided blood to Compton's brain. The

4

surgeon also testified that those injuries caused severe neurological damage and Compton never regained consciousness. Compton's family removed him from life support, and he died.

After Compton was taken to the hospital, defendant was transported to the police station. The officer who drove defendant to the police station testified that defendant fell asleep on the ride. At the station, defendant was interviewed by a detective from the prosecutor's office. Defendant told that detective that Compton had not shot himself; instead, Compton was shot when defendant and Compton were dry firing the guns and one of them went off. Defendant also told the detective that he panicked after the shooting and put all the guns in his safe before emergency medical help arrived.

Several law enforcement personnel who dealt with defendant after the shooting testified that he appeared to be under the influence of alcohol. Defendant consented to provide blood and urine samples and testing revealed that defendant's blood alcohol level was approximately .14 percent.

At defendant's home, the police recovered a spent .40 caliber shell casing and a live .40 caliber bullet under a table near the couch. In defendant's bedroom, police found the Glock 27 on the top of a bureau and the two handguns in a safe in the bedroom closet. The Glock 27 had its magazine in the gun and

the magazine contained nine .40 caliber bullets.  At trial, an officer explained that the Glock 27 had an extended clip that could hold ten bullets, with an additional bullet in the chamber.  The Glock 22 was found with the magazine outside the gun and one bullet in the chamber of the gun.  Both the Glock 22 and Glock 27 fire a .40 caliber bullet.  The second handgun in defendant's gun safe was an unloaded .38 caliber revolver.

At defendant's second trial, which was conducted in August 2018, thirty-one witnesses testified including several experts and defendant.  One of the state's experts was a ballistic expert.  He examined the Glock 27 and found that it was in working order.  He opined that the recovered shell casing had been fired from the Glock 27.  He also testified that the bullet recovered from Compton during the autopsy was too damaged to match it to a particular gun.

The state also called a Deptford police captain who supervised firearms instruction for the police department. [1]  The captain described the police department's gun training and safety policies.  In that regard, he explained that officers were only allowed to point a weapon at a person when performing a law-enforcement function.  The captain also testified that it would be an illegal

---

[1]  At the time of the incident in 2013, the captain was a lieutenant in the Deptford Township Police Department's special services division.

6

aggravated assault to point a weapon at someone when not exercising a law-enforcement function. The captain also explained that the Glock 27 was defendant's registered off-duty weapon.

During his testimony at trial, defendant contended that the shooting was an accident because he believed the Glock 27 was unloaded and he did not point the weapon at Compton. Defendant also testified that one of the responding police officers told him to call his union representative and that it was his understanding that his union representative would hire an attorney for him.

On cross-examination, the prosecutor asked defendant if he was "aware that it's illegal to point a firearm at or in the direction of any person, whether you think it's loaded or unloaded." Without objection, defendant responded that he understood that it was a crime to knowingly point a gun at another person.

In her summation, the assistant prosecutor made arguments about the call to the union representative and the criminal nature of pointing a firearm at someone. The assistant prosecutor argued that when defendant called his union representative, he was not acting like a person in a state of panic; rather, he was acting out of his own "self-preservation." In that regard, the assistant prosecutor argued:

> So defendant is outside, guzzling water, trying to sober up, trying to wash gun residue off his hands. Who

knows? But he's outside. No other suspect would have been able to guzzle water. And before David Compton is even taken out of the house for treatment, he is on the phone to his union representative. Again, self-preservation. And he falls asleep on the way to the police station.

What does that tell you? What do those facts tell you about his state of mind? He wants you to believe that he was in a panic over what happened. I don't know that that – those are the actions of someone in a panic over what happened.

With regard to pointing a gun at another person, the assistant prosecutor contended that such an act was a crime and that crime was part of a link in a chain of events showing defendant's reckless indifference. Specifically, the assistant prosecutor in her closing contended:

Even if everything defendant said to you is true - which the State submits to you that it's not - but even if what he said is true, it's still aggravated manslaughter, it's still is aggravated manslaughter.

Think of it as a chain, and each of the following things I am going to tell you is a link in that chain . . . .

. . . .

Link number four: He pointed the gun in the direction of another. There is some dispute – and we'll talk about it – as to whether or not he pointed the gun at [Compton], or if he pointed it at his T.V. The State submits that he pointed it at [Compton]. Defendant tells you he pointed it at his T.V. This is a very small

room. The T.V. is not far from [Compton] at all, and you'll see it in the picture.

The statute – there is a statute that says pointing a firearm at or in the direction of another human, whether or not you think it's loaded or unloaded – you can even think it's unloaded – it's a crime to do that. That's a crime. And you heard [the Captain] say that you never point a gun at something you don't intend to destroy. This is his supervisor, his instructor. He's heard this may times before.

Defendant did not object to the state's closing arguments. Instead, the defense contended that the shooting was an accident. In that regard, defense counsel suggested that Compton may have loaded the Glock 27 while defendant was sleeping.

After hearing all of the evidence, including the testimony of defendant, the jury in the second trial found defendant not guilty of murder and aggravated manslaughter, but convicted him of the lesser-included offense of second-degree reckless manslaughter.

II.

On this appeal, defendant presents four arguments for our consideration, which he articulates as follows:

POINT I – THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE TO INTRODUCE TESTIMONY THAT DEFENDANT CONTACTED HIS POLICE UNION REPRESENTATIVE, FROM

9

WHICH THE STATE IMPERMISSIBLY URGED THE JURY TO DRAW A NEGATIVE INFERENCE.

POINT II – DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY INTRODUCTION OF EVIDENCE THAT HE COMMITTED THE UNCHARGED CRIME OF POINTING A FIREARM, WHICH WAS COMBINED WITH ARGUMENT THAT THE JURY COULD CONSIDER THIS CRIME AS PROOF THAT HE HAD THE REQUISITE *MENS REA* FOR MANSLAUGHTER.

POINT III – THE ORDER REQUIRING DEFENDANT TO FORFEIT ALL PUBLIC EMPLOYMENT SHOULD BE VACATED BECAUSE THE DISQUALIFYING OFFENSE DID NOT INVOLVE OR TOUCH HIS EMPLOYMENT.

POINT IV – THE SENTENCE IS EXCESSIVE BECAUSE IT WAS NOT BASED ON A PROPER FINDING AND WEIGHING OF AGGRAVATING AND MITIGATING FACTORS.

A.    Testimony Regarding the Call to the Union Representative

During the state's case, a police officer testified that he overheard defendant call his union representative while defendant was in the backyard and other officers were inside the home attending to Compton. In her closing, the assistant prosecutor argued that defendant's call revealed his state of mind and showed that he was not panicking or in shock but was acting for his own "self-preservation." When defendant testified on direct examination, he explained

that he understood that his union representative would hire a lawyer on his behalf.

Defendant now argues that allowing the testimony concerning his call to his union representative violated his Fifth Amendment right against self-incrimination because it related to hiring an attorney. In that regard, defendant contends that "any reasonably-informed juror" would understand "that legal representation for a police officer is obtained through that officer's membership in the [Policemen's Benevolent Association] union." Defendant also asserts that the error was compounded when the trial court failed to give a limiting instruction.

It is improper for the state to elicit testimony about, or comment on, a defendant's request for an attorney to infer that defendant is guilty. State v. Marshall, 123 N.J. 1, 124 (1991); United States v. Williams, 556 F.2d 65, 66 (D.C. Cir. 1977). Accordingly, "[courts] should endeavor to excise any reference to a criminal defendant's invocation of his right to counsel." State v. Feaster, 156 N.J. 1, 75 (1998). When such references do not relate to the alleged crime and are permitted only to explain why questioning ended, a trial court has discretion to allow the testimony. Id. at 76. Nevertheless, in exercising that discretion, the court should give a limiting instruction explaining that

11

defendant's invocation of his right to counsel may not be used to infer guilt. Ibid.

The state did not violate defendant's Fifth or Sixth Amendment rights. The testimony elicited by the state only referred to defendant calling his union representative. There was no reference to defendant seeking legal counsel or to hire an attorney. Instead, the state sought the testimony to show defendant's state of mind; that is, he was not in shock or panicking, but was thinking about how he should proceed. We reject defendant's unsupported contention that the jury knew that the union representative would hire an attorney for defendant. There was no support for such an inference in the limited testimony elicited from the police officer who overheard defendant making the call to his union representative.[2]

The testimony about the union representative hiring an attorney came from defendant on his direct examination by his own counsel. Accordingly, defendant cannot seek reversal of the jury verdict on evidence he introduced. See State v. Munafo, 222 N.J. 480, 487 (2015) (citing State v. A.R., 213 N.J. 542, 561 (2013)). Moreover, defendant did not ask for a limiting instruction

---

[2] The testimony also fell within an exception to the hearsay rule since it was offered against defendant, a party opponent. See Griffin v. City of E. Orange, 225 N.J. 400, 419 (2016); N.J.R.E. 803(b)(1).

concerning his testimony and, therefore, we discern no reversible error or plain error. See State v. Anthony, 237 N.J. 213, 238 (2019); R. 2:10-2.

Finally, we note that the reference to the call to the union representative was relatively limited and was not a substantial part of the evidence presented or arguments made at defendant's second trial. Instead, defendant's credibility and state of mind were the central issues at trial. The trial record does not reflect that the testimony about defendant calling his union representative was "clearly capable of producing an unjust result." R. 2:10-2.

B.      The Evidence that Defendant Pointed the Gun at Compton

Defendant argues that the state introduced testimony that pointing a firearm at another person constituted the crime of aggravated assault. Defendant then argues that he was denied a fair trial because in its closing, the state argued that defendant committed that crime, which formed a "link in the chain" showing he acted with reckless indifference. In making that argument, defendant contends that the jury was never instructed on the elements of aggravated assault and there was a prejudicial "blurring of legal principles" that denied defendant due process.

Defendant did not object to the testimony about pointing a firearm at another person. Nor did defendant object to the state's arguments during its

closing. Furthermore, defendant did not request a jury charge on aggravated assault. Consequently, we review these issues for plain error. R. 2:10-2; State v. Funderburg, 225 N.J. 66, 79 (2016); State v. Camacho, 218 N.J. 533, 554 (2014).

In reviewing any claim of error relating to a jury charge, "[t]he charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005) (citing State v. Jordan, 147 N.J. 409, 422 (1997)). In addition, "[t]he error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Furthermore, counsel's failure to object to jury instructions "gives rise to a presumption that he did not view [the charge] as prejudicial to his client's case." State v. McGraw, 129 N.J. 68, 80 (1992).

The trial court correctly charged the jury on the elements of murder, aggravated manslaughter, and reckless manslaughter as a lesser-included offense. Accordingly, we discern no error in the jury instructions.

Moreover, we discern no reversible error in the arguments made in the state's closing. Read in full context, the state was not asking the jury to find defendant guilty merely because he pointed a firearm. Instead, the state

14

contended that defendant acted with knowing recklessness in pointing a firearm at Compton. Indeed, in making that argument, the state acknowledged that defendant contended he did not point the firearm at Compton; rather, he pointed the firearm at the screen on which the movie was playing. When considered in full context, the state did not cross the boundary between a fair argument and prosecutorial misconduct. See State v. R.B., 183 N.J. 308, 330 (2005); State v. McGuire, 419 N.J. Super. 88, 139 (App. Div. 2011).

    C.    Forfeiture of Public Employment

The Legislature has mandated that persons convicted of certain crimes must forfeit public employment. N.J.S.A. 2C:51-2(a). Specifically, that statute provides that any person holding public employment shall forfeit that position if the person is (a) convicted of an offense involving dishonesty, (b) convicted of a crime of the third-degree or higher, (c) convicted of an offense involving or touching the public employment, or (d) the "Constitution so provides." Ibid.

The forfeiture statute also mandates that if a person is convicted of an offense involving or touching his public employment that person "shall be forever disqualified" from holding any public office or position in New Jersey or a political subdivision of the State. N.J.S.A. 2C:51-2(d). In that regard, subsection (d) of the forfeiture statute states:

In addition to the punishment prescribed for the offense, and the forfeiture set forth in subsection [(a)] of N.J.S.A. 2C:51-2, any person convicted of an offense involving or touching his public office, position or employment shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions. As used in this subsection "involving or touching on his public office, position or employment" means that the offense was related directly to the person's performance in, or circumstances flowing from, the specific public office, position or employment held by the person.

In defendant's judgment of conviction, the trial court ordered: "Defendant is to forfeit all public employment." Defendant contends that that ruling was erroneous because his conviction did not involve or touch his public employment. We reject that argument as inconsistent with the plain language of N.J.S.A. 2C:51-2(a)(1). Defendant was convicted of a second-degree offense and under subsection (a)(1) his conviction was higher than a third-degree and, therefore, he had to forfeit his public employment as a Deptford police officer. In making his argument, defendant focused on N.J.S.A. 2C:51-2(a)(2), which requires forfeiture if his conviction involved or touched on his public employment as a police officer.

We are constrained, however, to remand for clarification whether the order covers future employment under N.J.S.A. 2C:51-2(d). The order entered,

16

which is part of the judgment of conviction, is not clear on whether defendant is disqualified from future public employment within this State. Moreover, the court made no findings concerning whether his conviction involved or touched on his public employment.[3]

Forfeiture of public employment is a collateral consequence. Accordingly, the lack of clarification in the trial court's judgment of conviction, does not preclude a remand for further proceedings and clarification of this issue. See State v. Ercolano, 335 N.J. Super. 236, 243 (App. Div. 2000) (explaining that forfeiture of a public office is a collateral consequence of a sentence and can be imposed after sentencing); State v. Horton, 331 N.J. Super. 92, 98-99 (App. Div. 2000) (same). Indeed, the forfeiture statute itself allows for an application to enter an order of forfeiture when the court inadvertently fails to order forfeiture at the time of conviction or sentencing. N.J.S.A. 2C:51-2(g). Accordingly, we remand the issue of whether defendant should be required to be disqualified from future public employment to the trial court.

---

[3] We note that at sentencing the assistant prosecutor stated that she would submit a forfeiture order to the court. We were not provided with such a separate order as part of the record on this appeal. Instead, as previously noted, the only forfeiture order in the record is contained in the judgment of conviction.

D.    The Sentence

We review sentencing determinations under a deferential standard. State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 594, 606 (2013)). We will not substitute our judgment for the judgment of the sentencing court. Lawless, 214 N.J. at 606 (first citing State v. Cassady, 198 N.J. 165, 180 (2009); then citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). Instead, we will affirm a sentence unless

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Miller, 237 N.J. 15, 28 (2019) (alteration in original) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).]

Defendant was sentenced to seven years in prison subject to NERA. That sentence fell within the mid-range of a conviction for a second-degree crime. N.J.S.A. 2C:43-6(2) (setting forth a range of five to ten years of imprisonment for a second-degree conviction). Because defendant was convicted of manslaughter, his sentence was subject to NERA. N.J.S.A. 2C:43-7.2(d)(2).

Defendant contends that the sentencing court erred in finding and balancing the applicable aggravating and mitigating factors and the court did not consider the real time consequences of a NERA sentence. The sentencing court found aggravating factors one, the nature and circumstance of the offense and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner (N.J.S.A. 2C:44-1(a)(1)); factor three, the risk of re-offense (N.J.S.A. 2C:44-1(a)(3)); and factor nine, the need for deterrence (N.J.S.A. 2C:44-1(a)(9)). The sentencing court also found mitigating factors two, defendant did not contemplate that his conduct would cause or threaten serious harm (N.J.S.A. 2C:44-1(b)(2)); factor four, there were substantial grounds tending to excuse or justify defendant's conduct (N.J.S.A. 2C44-1(b)(4)); and factor seven, defendant had no prior criminal record (N.J.S.A. 2C:44-1(b)(7)).

Having reviewed the sentencing record, we find no error in the court's determinations of the aggravating and mitigating factors except for aggravating factor one. All the other aggravating and mitigating factors are supported by facts in the record and the applicable law. Moreover, the sentencing court appropriately considered but rejected defendant's argument for the application of additional mitigating factors.

A-1627-18T4

The sentencing court erred, however, in finding aggravating factor one. Aggravating factor one calls on the court to consider the nature and circumstances of the offense and the role of the actor in committing that offense, including whether or not it was committed in an especially heinous, cruel or deprived manner. In finding that factor, the sentencing court focused on defendant's actions after the shooting by not calling 911 and, instead, calling another number, and in not attending to the injured victim. There was no evidence presented at trial that any immediate medical attention to Compton would have increased his chances of survival. More to the point, defendant was convicted of reckless manslaughter, which focuses on the act causing the death; here, that would be the shooting. Defendant's conduct following the shooting does not go to any of the elements that constituted the crime for which he was convicted. Accordingly, it was an error to apply aggravating factor one in sentencing defendant.

Consequently, we remand for a resentencing. In doing so, we note that we find nothing shocking about a seven-year sentence imposed for the conviction of second-degree reckless manslaughter. Nevertheless, the court will need to rebalance the remaining aggravating factors against the mitigating

factors it found and determine whether it will impose the same or a different sentence.

In summary, we affirm defendant's conviction. We remand for two limited purposes: (1) consideration of whether an order should be entered barring defendant from future public employment; and (2) a rebalancing of the aggravating and mitigating factors without consideration of aggravating factor one and imposition of a new sentence.

Affirmed in part, reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21