73 A.3d 496

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. WILLIAM O'DRISCOLL, DEFENDANT–RESPONDENT.

Argued May 13, 2013—Decided September 18, 2013.

464

*Boris Moczula,* Assistant Attorney General, argued the cause for appellant (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney).

*Colin E. Bonus* argued the cause for respondent (Law Offices of *Jonathan F. Marshall,* attorneys; *Jeff E. Thakker,* of counsel).

*Jeffrey E. Gold* argued the cause for amicus curiae New Jersey State Bar Association (*Ralph J. Lamparello,* President, attorney; *Kevin P. McCann,* Immediate Past President, of counsel; *Mr. Gold* and *Kimberly A. Yonta,* on the brief).

Chief Justice RABNER delivered the opinion of the Court.

A police officer arrested defendant William O'Driscoll after watching him drive his SUV across the center line of the road— two times—and then fail a number of field tests. Consistent with the implied consent and refusal laws, *N.J.S.A.* 39:4-50.2 and *N.J.S.A.* 39:4-50.4a, the officer read defendant a standard statement designed to inform him of the consequences of refusal and to impel him to provide a sample of his breath.

Although the officer correctly told defendant that if he refused, his license could be revoked for up to twenty years, the officer read from an outdated form and misstated three other parts of the potential penalty: the officer said the minimum period of revocation was six months, not seven; the minimum fine was $250, not $300; and the maximum fine was $1000, not $2000.

Both the municipal court and the Law Division found the discrepancies immaterial and convicted defendant of refusal. The Appellate Division reversed. It relied on *State v. Marquez,* 202 *N.J.* 485, 998 *A.*2d 421 (2010), and *State v. Schmidt,* 206 *N.J.* 71,

19 *A*.3d 457 (2011), and concluded that the State had failed to inform defendant of the consequences of refusal.

We disagree. Courts should consider whether an error in the reading of the standard statement is material in light of the statutory purpose to inform motorists and impel compliance. To do so, courts are to examine whether a defendant reasonably would have made a different choice and submitted to a breath test had the officer not made an error in reciting the statement. An immaterial variation from the standard form does not require reversal of a conviction for refusal.

Because the errors in this case were not material and could not have reasonably affected defendant's choice to refuse to provide a breath sample, we reverse and reinstate defendant's conviction.

I.

We derive the following facts from the testimony of Officer Michael Gromek of the Harding Township Police Department. The officer testified at defendant's municipal court trial.

At about 12:20 a.m. on November 15, 2009, Officer Gromek stopped defendant's sport utility vehicle (SUV) after watching it cross the center line of the road for several seconds and later straddle the line for about two-tenths of a mile. After the officer approached the passenger side of the car and knocked on the front window, defendant opened the rear window at first. When defendant opened the front window, the officer smelled a very strong odor of alcohol from inside the car. During a brief exchange, the officer noticed that defendant slurred his words and observed that his eyes were watery, bloodshot, and droopy. Defendant denied drinking.

The officer asked defendant to perform certain tests while still in the car, but defendant could not successfully complete any of them. He could not recite the alphabet from the letter "E" to the letter "P" without mistakes; he could not count backwards from the number forty-five to the number twenty-three without mis-

takes; and he could not perform a finger-dexterity test. In addition, according to the officer, defendant spoke very slowly, and his speech was slurred.

Defendant complied with the officer's request to get out of the SUV but had trouble keeping his balance. He swayed, staggered, and kept his feet wide apart for balance as he walked to the rear of the car. Defendant then failed two field sobriety tests: a one-leg-stand test and a walk-and-turn test.

When the officer asked for permission to move the SUV to a safer location, defendant agreed and volunteered that there was an open bottle of alcohol on the front passenger floor. The officer found an open bottle of champagne that was partly covered by a blanket and almost empty.

The officer then placed defendant under arrest and brought him to police headquarters. During the drive to the station, the officer smelled alcohol inside the police car.

After observing defendant for twenty minutes at the police station, the officer asked him to submit to a breath test. The officer read the following from the January 21, 2004 version of the New Jersey Motor Vehicle Commission Standard Statement for Operators of a Motor Vehicle:

1. You have been arrested for operating a motor vehicle while under the influence of intoxicating liquor or drugs with a blood alcohol concentration of 0.08% or more.

2. You are required by law to submit to the taking of samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood.

3. A record of the taking of the samples, including the date, time and results, will be made. Upon your request, a copy of that record will be made available to you.

4. Any warnings previously given to you concerning your right to remain silent and your right to consult with an attorney do not apply to the taking of breath samples and do not give you the right to refuse to give, or to delay giving, samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood. You have no legal right to have an attorney, physician, or anyone else present, for the purpose of taking the breath samples.

5. After you have provided samples of your breath for chemical testing, you have the right to have a person or physician of your own selection, and at your own expense, take independent samples and conduct independent chemical tests of your breath, urine or blood.

6. If you refuse to provide samples of your breath, you will be issued a separate summons for this refusal.

7. Any response that is ambiguous or conditional, in any respect, to your giving consent to the taking of breath samples will be treated as a refusal to submit to breath testing.

8. According to *N.J.S.A.* 39:4–50.4a, if a court of law finds you guilty of refusing to submit to chemical tests of your breath, then your license to operate a motor vehicle will be revoked by the court for a period of no less than *six* months and no more than 20 years. The Court will also fine you a sum of no less than *$250* and no more than *$1,000* for your refusal conviction.

9. Any license suspension or revocation for a refusal conviction will be independent of any license suspension or revocation imposed for any related offense.

10. If you are convicted of refusing to submit to chemical tests of your breath, you will be referred by the Court to an Intoxicated Driver Resource Center and you will be required to satisfy the requirements of that center in the same manner as if you had been convicted of a violation of *N.J.S.A.* 39:4–50, or you will be subject to penalties for your failure to do so.

11. I repeat, you are required by law to submit to the taking of samples of your breath for the purpose of making chemical tests to determine the content of alcohol in your blood. Now, will you submit the samples of your breath?
[ (Emphasis added).]

The statement that the officer read was outdated. The standard statement had been revised as of April 26, 2004, and the penalties listed in paragraph eight of the newer version differed from the version the officer read in three ways: the minimum period for revocation of one's license was seven months, not six; the minimum fine was $300, not $250; and the maximum fine was $2000, not $1000.

■ In response to the final question of the standard statement, defendant replied, in slurred speech, "I don't know what to do." The officer then read a supplemental statement from the form and asked defendant if he would provide samples of his breath.[1] Defendant again responded, "I don't know what to do." The officer recorded both responses by hand on the January 2004

---

[1] If a driver provides an ambiguous response, the officer must read an additional statement on the standard form to ensure the suspect knows the response was unacceptable and will be considered a refusal. *See State v. Widmaier*, 157 *N.J.* 475, 498–99, 724 *A.*2d 241 (1999) (urging MVC to revise standard statement accordingly).

version of the form. (When he finalized his report, he typed defendant's answers onto the April 2004 version of the form.)

The officer next read defendant his *Miranda*[2] warnings. Shortly after, defendant noted that he was taking a number of medications and had last taken Ambien at 11:30 p.m. the prior evening—about an hour before his arrest.

The police charged defendant in separate summonses with five motor vehicle offenses: driving while intoxicated (DWI), *N.J.S.A.* 39:4–50; refusal to submit to a breath test, *N.J.S.A.* 39:4–50.2;[3] reckless driving, *N.J.S.A.* 39:4–96; failure to drive on the right side of the roadway, *N.J.S.A.* 39:4–82; and possessing an open container of alcohol in a motor vehicle (open container), *N.J.S.A.* 39:4–51b.

At a trial in municipal court on August 30, 2010, the State called Officer Gromek, and defendant also presented one witness, Dr. Gary Lage, an expert in pharmacology and toxicology. Dr. Lage testified that, based on his review of the discovery and the officer's testimony, defendant's actions at the time of the traffic stop were consistent with someone who was under the influence of Ambien. The expert had not spoken with defendant in formulating his opinion.

The municipal court judge found Officer Gromek "extremely credible" and rejected defendant's Ambien defense. Based on the evidence, the judge convicted defendant of the failure to keep right, open container, and DWI charges. The judge dismissed the reckless driving charge and noted that "the DWI was ... the more appropriate charge." That determination is not before us.

The municipal court judge also convicted defendant of refusal. Although the judge noted that the officer read an outdated version of the standard statement, the judge found the differences "very

---

[2] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

[3] The correct citation is *N.J.S.A.* 39:4–50.4a.

immaterial" and concluded that they "would not have made any difference to the defendant on that evening."

On the failure to keep right, open container, and DWI charges, the judge imposed a total of $1042 in fines, costs, and assessments. The DWI conviction carried additional penalties: the loss of driving privileges for three months; twelve hours at an Intoxicated Driver Resource Center; and the required use of an ignition interlock device for six months after the restoration of defendant's driver's license. On the refusal charge, the judge ordered a consecutive, seven-month license suspension, a $306 fine, $33 in court costs, and a $100 DWI surcharge. The court stayed the ten-month license suspension for twenty days to allow defendant to appeal.

Defendant appealed only the DWI, refusal, and open container convictions. After a trial de novo in the Law Division on May 4, 2011, *see R.* 3:23-8(a), the court found defendant guilty of all three charges. With regard to the refusal charge, the Law Division judge found that the inconsistencies in the outdated standard statement were "de minimis" and "immaterial." He also noted that the doctrine of substantial compliance applied. In addition, the court rejected defendant's Ambien defense.

The court sentenced defendant to concurrent, not consecutive, suspensions of his driving privileges in New Jersey for a total of seven months. The court also imposed the same fines, penalties, and court costs.

Defendant appealed. The Appellate Division denied defendant's motion to stay his sentence. In a later, unpublished opinion dated March 1, 2012, a two-judge panel of the Appellate Division affirmed the DWI and open container convictions but reversed the conviction for refusal.

The panel found it "highly doubtful that defendant would have been more likely to feel impelled to give a breath sample" had he been read the correct penalties from the April 2004 form. But the panel explained, "we judge the adequacy of the statement read to

[defendant] not based upon its likelihood to affect his actions but rather, whether it satisfied the legislative mandate."

Relying on *Marquez*, the Appellate Division noted that " 'reading the standard statement is an element of a refusal offense.' " (Quoting *Marquez*, *supra*, 202 *N.J.* at 506 n. 8, 998 *A.*2d 421). The panel also cited language from *Schmidt* that the standard statement "must 'clearly delineate[ ] the penalties for a refusal.' " (Alteration in original) (quoting *Schmidt*, *supra*, 206 *N.J.* at 82, 19 *A.*3d 457). The panel concluded that because "the Standard Statement read to defendant . . . provided inaccurate information about the penalties he faced," the statement "did not satisfy the statutory mandate" to inform defendant of the consequences of refusal. The panel therefore felt "constrained" to reverse defendant's refusal conviction.

We granted the State's petition for certification, which addressed the refusal conviction. 212 *N.J.* 199, 52 *A.*3d 177 (2012). Because defendant did not file a cross-petition, only the refusal charge is before the Court. *See R.* 2:12–11. Defendant's other convictions remain intact.

## II.

The Attorney General, on behalf of the State, argues that defendant's conviction for refusal should be reinstated because he was adequately informed of the consequences of refusing to submit to a breath test. According to the State, the officer's inadvertent deviation from the exact language of the standard statement was inconsequential. The State contends that the Appellate Division misapplied *Marquez* and that de minimis variations from the standard statement do not warrant reversal of a refusal conviction. In this case, the State notes that defendant's sentence fell within the range the officer provided. In the alternative, the State asks that we "reconsider *Marquez*'s interpretation that the 'informed' feature is an element of the refusal offense."

Defendant argues that the Appellate Division correctly applied the law. Because the penalties recited to him were not correct,

defendant contends that the State has not met the statutory requirement to inform a driver of the consequences of refusal. As a result, defendant maintains that he could not be convicted of refusal as a matter of law. Defendant also submits that the doctrine of substantial compliance does not apply in this case and, more generally, that it would undermine the existing clear standard in refusal cases. Defendant also argues that the State failed to present any special justification to overrule *Marquez*.

We granted amicus curiae status to the New Jersey State Bar Association (NJSBA). The NJSBA submits that although a minor variation from the standard statement might not violate legislative intent, an error that goes to the intent of the refusal statute—for example, reciting the wrong penalties—is fatal because the flaw fails to inform the driver of the consequences of refusal. Beyond that, the NJSBA challenges the current standard statement that the Attorney General issued in 2012. Amicus claims that the form is deficient because it does not specify the mandatory minimum penalties for refusal. Amicus asks this Court to take judicial notice of the new form and rule on whether it complies with the law.

In response, the State points out that the 2012 standard statement has nothing to do with the facts of this case and is not properly before the Court. The State also defends the current statement and maintains that it is an accurate, simplified, legally sufficient form that is entitled to deference.

### III.

This case requires us to examine the State's drunk driving laws. The overall legislative scheme is designed " 'to curb the senseless havoc and destruction caused by intoxicated drivers.' " *Marquez, supra,* 202 *N.J.* at 496, 998 *A.*2d 421 (quoting *State v. Tischio,* 107 *N.J.* 504, 512, 527 *A.*2d 388 (1987), *appeal dismissed,* 484 *U.S.* 1038, 108 *S.Ct.* 768, 98 *L.Ed.*2d 855 (1988)).

The Legislature criminalized drunk driving in 1921. *L.* 1921, c. 208, § 14; *see also N.J.S.A.* 39:4–50. To improve enforcement

efforts and address the high rate of refusal by motorists who declined to submit to blood-alcohol tests, the Legislature in 1966 enacted the implied consent law, *N.J.S.A.* 39:4–50.2, and the refusal law, *N.J.S.A.* 39:4–50.4a. *Marquez, supra,* 202 *N.J.* at 497, 998 *A.*2d 421.

■ The implied consent law declared that all motorists driving on any public road are "deemed to have given . . . consent" to a breath test. *L.* 1966, *c.* 142, § 2. The refusal statute imposed a six-month license revocation as a penalty if a driver refused to give a breath sample. *Id.* § 4. "The simultaneous passage of those laws was designed to encourage people arrested for drunk driving to submit a breath sample and to enable law enforcement to obtain objective scientific evidence of intoxication." *Marquez, supra,* 202 *N.J.* at 497, 998 *A.*2d 421.

Because the refusal statute's penalties were insufficient to achieve those aims, the Legislature increased the penalties in 1977. *See id.* at 498, 998 *A.*2d 421 (citing N.J. Motor Vehicle Study Comm'n, *Report* 151 (1975)). A first offense for refusal would result in a ninety-day license revocation; a second offense would lead to a new one-year period of revocation. *See L.* 1977, *c.* 29, § 4. "Because of the more stringent penalty," the Legislature added to the implied consent statute "a requirement that police officers 'inform the person arrested of the consequences of refus[al].' " *Marquez, supra,* 202 *N.J.* at 498, 998 *A.*2d 421 (alteration in original) (quoting *L.* 1977, *c.* 29, § 3).

The Legislature has periodically increased the penalties for refusal since 1977. *See, e.g., L.* 1981, *c.* 537, § 2 (raising penalty to six-month license suspension for first offense and two years for subsequent offense, and adding fine of $250 to $500); *L.* 1994, *c.* 184, § 2 (increasing revocation period for third or subsequent refusal convictions to ten years). Effective April 26, 2004, the Legislature imposed the penalties now in effect. *See L.* 2004, *c.* 8, § 1 (codified as amended at *N.J.S.A.* 39:4–50.4a). It raised the penalty for a first offense to a license revocation of not less than seven months or more than one year, and a fine of $300 to $500.

*N.J.S.A.* 39:4–50.4a(a). Increasing fines and penalties apply to second and subsequent offenses. *See ibid.* For refusal offenses that take place on or near school property or school crossings, fines and penalties are increased up to a maximum license suspension for twenty years and a $2000 fine for a third or subsequent offense. *N.J.S.A.* 39:4–50.4a(b).

As part of the 1977 amendment to the implied consent law—which required police officers to inform drivers of the consequences of refusal, *L.* 1977, *c.* 29, § 3 (codified as amended at *N.J.S.A.* 39:4–50.2(e))—the Legislature also directed that "[a] standard statement, prepared by the director [of the Division of Motor Vehicles], shall be read by the police officer to the person under arrest," *ibid.* The responsibility to prepare the standard statement was transferred to the Attorney General in 2009. *See* 41 *N.J.R.* 2825(a) (Aug. 3, 2009).

## IV.

### A.

■■■■ This is a case of statutory interpretation. Our task, then, is to discern and give effect to the intent of the Legislature. *State v. Rangel,* 213 *N.J.* 500, 508, 64 *A.*3d 558 (2013) (citation omitted). To do so, we start with the plain language of the statute. *Id.* at 509, 64 *A.*3d 558 (citing *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005)). If the language does not lead to a single, clear meaning, we can look to extrinsic evidence, including legislative history, for guidance. *Ibid.* (quoting *State v. Gelman,* 195 *N.J.* 475, 482, 950 *A.*2d 879 (2008)).

### B.

*Marquez, supra,* explained how the implied consent and refusal statutes interact: "the refusal statute requires officers to *request* motor vehicle operators to submit to a breath test; the implied consent statute tells officers *how* to make that request." 202 *N.J.*

at 501, 998 *A.*2d 421. *Marquez* also identified the four elements of a refusal conviction:

(1) the arresting officer had probable cause to believe that defendant had been driving or was in actual physical control of a motor vehicle while under the influence of alcohol or drugs; (2) defendant was arrested for driving while intoxicated; (3) the officer requested defendant to submit to a chemical breath test and informed defendant of the consequences of refusing to do so; and (4) defendant thereafter refused to submit to the test.

[*Id.* at 503, 998 *A.*2d 421 (citing *N.J.S.A.* 39:4–50.2(e); *N.J.S.A.* 39:4–50.4a(a)).]

Thus, consistent with the language in the implied consent statute, *Marquez* noted that officers are to read the standard statement to inform defendants of the consequences of refusal. *Id.* at 501, 506 n. 8, 998 *A.*2d 421.

*Marquez* applied the law in the case of a driver who did not speak or understand English. *Id.* at 506, 998 *A.*2d 421. The majority concluded that to "inform" a motorist in the manner the Legislature intended means that officers "must convey information in a language the person speaks or understands." *Id.* at 507, 998 *A.*2d 421. Otherwise, the law would allow defendants to be convicted of refusal based on "empty warnings that fail to inform them." *Id.* at 508, 998 *A.*2d 421. The opinion rested on the Legislature's intent to inform motorists of the consequences of refusal—because of the more stringent penalties the Legislature had imposed, *id.* at 507, 998 *A.*2d 421 (citations omitted)—in order to "impel the driver to take the test," *id.* at 508, 998 *A.*2d 421 (quoting *State v. Badessa,* 185 *N.J.* 303, 314, 885 *A.*2d 430 (2005)). Drivers too drunk to understand the language they speak, though, could not challenge a conviction on that ground. *Id.* at 513–14, 998 *A.*2d 421.

Three members of the Court dissented and stated that the implied consent law "impose[s] a procedural requirement on police officers to 'inform' a defendant," not a "substantive element of a refusal conviction." *Id.* at 522–23, 998 *A.*2d 421 (LaVecchia, J., dissenting in part and concurring in judgment). The dissent concluded that courts "need only determine whether *the officer* made objectively reasonable efforts to inform the defendant under the circumstances." *Id.* at 524, 998 *A.*2d 421.

We need not revisit the differences between the opinions in *Marquez* to resolve this case. Neither the majority nor the dissent suggested that any deviation from the written standard statement would automatically amount to a failure of proof. The two opinions instead focused on the meaning of the requirement to *inform* motorists of the consequences of refusal. Neither required that the standard statement be recited perfectly or even addressed the question.

The language of the implied consent statute also does not require absolute precision. It directs that the statement be read. *N.J.S.A.* 39:4–50.2(e). To be sure, we expect that police officers will read the correct statement in its entirety and not deviate from it. And we have no reason to believe that police are not using the current form as a general rule. To the contrary, the Attorney General has represented to us that police officers "[o]verwhelmingly" use the right standard statement. We agree with the Attorney General that officers have no incentive to use the wrong form.

But if an officer misreads part of the statement, reversal of a refusal conviction is not necessarily required. Instead, we consider whether the error is material in light of the statutory purpose to inform motorists and impel compliance.

We find guidance for this approach in other familiar areas. For example, *Miranda* and its progeny require the police to advise suspects of certain well-known rights. As the United States Supreme Court directed, "unless other fully effective means are" used, a criminal suspect

must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

[*Miranda, supra,* 384 *U.S.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726.]

Nonetheless, the Supreme Court has "never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth v. Eagan,* 492 *U.S.* 195, 202, 109 *S.Ct.*

2875, 2880, 106 *L.Ed.*2d 166, 176 (1989). The proper "inquiry is simply whether the warnings reasonably convey to [a suspect] his rights as required by *Miranda.*" *Id.* at 203, 109 *S.Ct.* at 2880, 106 *L.Ed.*2d at 177 (alteration in original) (citation and internal quotation marks omitted). Thus, when a police officer recites the warnings to a suspect, an error does not render them defective as long as "[t]he language used . . . adequately inform[ed the defendant] of the substance of his constitutional rights." *State v. Melvin,* 65 *N.J.* 1, 14, 319 *A.*2d 450 (1974) (voicing emphatic disapproval of deviations "from the words of the *Miranda* opinion" while noting that "under the circumstances of this case [no] constitutional error was committed").

██ Likewise, when a defendant seeks to withdraw a guilty plea, courts should examine, among other things, whether "the court and prosecutor misinformed the defendant about a *material* element of the plea negotiation" and whether "the defendant was not informed and thus did not understand *material terms and relevant consequences* of the guilty plea." *State v. Slater,* 198 *N.J.* 145, 159, 966 *A.*2d 461 (2009) (emphases added) (citations omitted); *see also Black's Law Dictionary* 1066 (9th ed. 2009) (defining "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential"). In that context, courts have considered whether the defendant reasonably would have made a different choice had the State conveyed the missing or correct information. *See State v. Howard,* 110 *N.J.* 113, 123, 539 *A.*2d 1203 (1988) ("[T]he plea will not be vacated if knowledge of the consequences would not have made any difference in the defendant's decision to plead.").

██ The same type of analysis—one that focuses on whether the State has informed the defendant of material facts—should apply when a police officer reads the wrong version of the standard statement or misreads the current form. Under that approach, discrepancies that would not have influenced a reasonable driver's choice to submit to a breath test would not be considered material and would not require reversal of a conviction

for refusal. On the other hand, substantive errors that do not adequately inform motorists of the consequences of refusal and would affect a reasonable person's decision-making would be problematic. To decide whether a deviation from the standard statement is material under that standard requires a case-by-case evaluation of the facts.

Such an approach does not depart from prior case law. Neither *State v. Duffy*, 348 *N.J.Super.* 609, 613, 792 *A*.2d 555 (App.Div. 2002), cited approvingly in *Marquez, supra,* 202 *N.J.* at 508, 998 *A*.2d 421, nor *Schmidt* requires a different rule. In *Duffy, supra,* a police officer interpreted the defendant's equivocal response to the standard statement as a refusal and did not read any part of the required supplemental statement. 348 *N.J.Super.* at 612, 792 *A*.2d 555. The nature of the "incomplete warnings" given in *Duffy, see Marquez, supra,* 202 *N.J.* at 508, 998 *A*.2d 421, is quite different from what happened here.

Defendant also emphasizes dicta in *Schmidt, supra,* which notes that "the statutory mandates are satisfied" "provided the Standard Statement clearly delineates the penalties for a refusal." 206 *N.J.* at 82–83, 19 *A*.3d 457. Defendant reasons from that language that any time incorrect penalties are recited, there can be no refusal conviction. *Schmidt,* however, addressed whether the police must read the additional statement to drunk drivers who agree to submit to a breath test but do not provide an adequate sample or sufficient breath volume. *Id.* at 80, 84, 19 *A*.3d 457. The decision did not analyze how to assess errors in the standard statement about the penalties for refusal.

## V.

 We now apply the above principles. Here, an officer read defendant the standard statement in a language he understood. The officer informed defendant that he was required to submit a sample of his breath and that, if he refused, his license could be revoked for up to twenty years. The officer also incorrectly told defendant that he faced a minimum six-month period of revocation

instead of seven months. In addition, the officer erred when he said the minimum fine was $250, instead of $300, and the maximum fine was $1000, instead of $2000.

We find that the officer's mistakes were inconsequential. The officer read the standard statement and informed defendant both that the breath test was mandatory and that serious consequences—revocation of his license for a period from six months up to twenty years—would result if he did not submit to the test. In other words, as the Legislature intended, the officer used the standard statement to inform defendant of the consequences of refusal in a manner that should have impelled a reasonable person to comply. It is difficult to see how the minor discrepancies in this case could have influenced that decision. Like the Appellate Division, we are "highly doubtful" that the errors reasonably could have affected defendant's choice. Because the errors were not material, we find that the State satisfied the elements of the refusal statute.

We also note that the sentence imposed—both the amount of time of the license suspension and the fine—fell within the ranges the officer identified; in particular, the suspension of defendant's license for seven months was within the range of six months to twenty years that defendant was told to expect.

## VI.

Amicus injects a new issue into the case: whether the current standard statement that the Attorney General issued in 2012, years after defendant's arrest, complies with the law. " '[A]s a general rule, an *amicus curiae* must accept the case before the court as presented by the parties and cannot raise issues not raised by the parties.' " *State v. Lazo,* 209 *N.J.* 9, 25, 34 *A.*3d 1233 (2012) (quoting *Bethlehem Twp. Bd. of Educ. v. Bethlehem Twp. Educ. Ass'n,* 91 *N.J.* 38, 48–49, 449 *A.*2d 1254 (1982)); *see also State v. Gandhi,* 201 *N.J.* 161, 191, 989 *A.*2d 256 (2010) ("[A]n amicus must take the case on appeal as they find it."). For that reason, we do not opine in any way on the content of the current

standard statement and, specifically, whether the form is defective because it does not inform drivers of the mandatory minimum period of time their license will be suspended if they refuse to submit a breath sample.

## VII.

For the reasons stated above, we reverse the judgment of the Appellate Division and reinstate defendant's conviction for refusal.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS and PATTERSON and Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned)—7.

*Opposed*—None.