NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1965-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JULIAN SANDERS,

      Defendant-Appellant.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **May 13, 2021** |
| **APPELLATE DIVISION** |

Argued March 1, 2021 – Decided May 13, 2021

Before Judges Sabatino, Currier and Gooden Brown.
(Judge Sabatino concurring).

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Indictment No. 17-07-
1979.

Morgan A. Birck, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora,
Public Defender, attorney; Morgan A. Birck, of
counsel and on the brief).

Matthew E. Hanley, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause
for respondent (Theodore N. Stephens II, Acting
Essex County Prosecutor, attorney; Matthew E.
Hanley, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

On July 20, 2017, defendant was charged in a four-count indictment with first-degree murder, N.J.S.A. 2C:11-3(a)(1) (count one); fourth-degree unlawful possession of a weapon, namely, a knife, N.J.S.A. 2C:39-5(d) (count two); third-degree possession of the knife for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count three); and third-degree endangering an injured victim, N.J.S.A. 2C:12-1.2(a) (count four).

The charges stemmed from defendant fatally stabbing Kendall Anthony on May 19, 2017, following an altercation during which Anthony forbade defendant from entering a store, threatened to beat defendant up, and threw a punch at defendant when he refused to heed his warnings. Defendant dodged the punch and stabbed Anthony once in the chest with a knife. Anthony staggered around, continued to yell at defendant, and collapsed on the ground twice, remaining on the ground after he collapsed the second time. Defendant left the scene without calling for medical assistance and went home. Anthony, who was breathing but unconscious when police responded, was transported to the hospital where he died the following morning from the stab wound.

The key pieces of evidence presented at the five-day jury trial consisted of video surveillance footage of the entire encounter and defendant's statement

to police, during which he admitted stabbing the victim in self-defense. The judge instructed the jury on self-defense as applied to all charges except the endangering charge. Following the trial, the jury convicted defendant of endangering and acquitted him of the remaining charges, apparently accepting defendant's self-defense claim. On November 9, 2018, defendant was sentenced to four years' probation.

On appeal, defendant raises the following single point for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT SELF-DEFENSE APPLIED TO THE ENDANGERING AN INJURED VICTIM CHARGE. U.S. CONST. AMEND XIV; N.J. CONST. ART. I, ¶ 1, 9, 10.
>
>> A. Self-Defense Applies To Endangering An Injured Victim.
>>
>> B. Because The Jury Found That Defendant Was Acting In Self-Defense, The Conviction For Endangering An Injured Victim Should Be Vacated And The Charge[] Dismissed.

For the reasons that follow, we affirm.

## I.

We glean these facts from the trial record. Just before midnight on May 19, 2017, Newark police officers were dispatched to a strip mall following a

A-1965-18

reported stabbing. Upon arrival, they observed a man later identified as Kendall Anthony lying on the ground in front of one of the stores bleeding from a stab wound. Anthony was breathing but unconscious when the officers arrived. An ambulance transported Anthony to University Hospital where he died the following morning from his injuries. The medical examiner subsequently determined that Anthony died from a single stab wound through the heart.

During the investigation, police obtained surveillance video of the stabbing from the store in question. An Essex County Prosecutor's Office detective identified defendant from viewing the video and interviewing witnesses. The detective arrested defendant on May 22, 2017, and transported him to the prosecutor's office where he provided a recorded statement after waiving his Miranda[1] rights.

In his statement, which was played for the jury, defendant stated he was attempting to enter the store to "get . . . a cigarette" when Anthony "approach[ed him]" and told him he could not "go inside the store." An argument ensued during which defendant, then forty-seven years old, protested being "disrespect[ed]" by someone who was his junior and barred entry by someone who had no ownership interest in the store. In response, Anthony

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

threatened "to beat [defendant] up in front of [the] people" who were standing outside. The argument escalated with defendant refusing to be "bull[ied]" or manhandled by Anthony while Anthony repeatedly threatened "to knock [defendant's] ass out." According to defendant, Anthony threatened "to knock [him] out" "several times." Believing that Anthony was "threatening [his] life," defendant produced a knife from his pocket, held it in his hand, and told Anthony, "I don't want no problem with you at all." Defendant stated "[he] was trying to scare [Anthony] away" with the knife.

Ignoring the knife, Anthony "swung [at defendant]." Defendant "move[d] back," dodged the punch, "c[a]me . . . forward," and stabbed Anthony in the chest. Afterwards, "[defendant] just went home" and "threw [the knife] in [a] backyard somewhere around the area."[2] Defendant did not call for medical assistance. Defendant explained that "[he] wasn't trying to hurt [Anthony]" and "was just trying to keep him away from [him] by showing him" the knife, but instead "hit [Anthony] in the wrong place." He "found out the next day that [Anthony] had passed away."

---

[2] Police never recovered the knife.

Defendant stated repeatedly that he acted "in self[-]defense" to "try[] to protect himself" from a much younger man.[3] He conceded "[he] could have prevented it . . . by just walking away, but [he] just wanted a cigarette." Defendant told the detective that he had encountered Anthony "[a]bout five or six times" in the past and had another confrontation with him two months prior. However, the prior confrontation "didn't go too far," and Anthony ended up admitting "[he] was wrong."

The five-minute surveillance video depicting the entire encounter was also played for the jury. In the video, defendant and Anthony are visibly engaged in a verbal exchange lasting approximately three minutes. Approximately ten seconds after the verbal altercation began, defendant reached into his pocket and produced a knife. Anthony and defendant then yelled in each other's face while defendant brandished the knife. When Anthony swung at defendant's head, defendant moved back to avoid the punch, and then stabbed Anthony once in the chest. Anthony immediately backed away from defendant, continued to yell at him, and then looked down at his chest, as if realizing for the first time that he had been stabbed and was bleeding. Anthony walked around, momentarily entering and exiting the store,

---

[3] Based on the autopsy, Anthony was twenty-six years old, six feet, one inch tall, and weighed 204 pounds. During processing, defendant told police he was five feet, nine inches tall, and weighed 165 pounds.

A-1965-18

before collapsing outside on the ground. After the stabbing, defendant observed Anthony for about thirty seconds and then walked away when Anthony collapsed. After defendant walked out of the camera's angle, an unidentified individual helped Anthony stand up, after which Anthony stumbled and collapsed on the ground a second time.

Defendant did not testify at trial.

## II.

On appeal, defendant argues the judge erred in not "instruct[ing] the jury that self-defense applie[d]" to the endangering charge. According to defendant, the "principles of the code [of criminal justice] support" the application of self-defense to the charge. Further, defendant asserts that "if [he] was acting in self-defense when he used force against Anthony, he could not be guilty of endangering" because "the endangering statute requires that a defendant leave a person who has been the victim of a crime, not merely a person who has been injured." Defendant continues that "[i]n the case of self-defense," where his conduct was justified, "no crime has been committed." Therefore, he was not liable for endangering an injured "victim."

As stated, the jury was instructed on self-defense as applied to the homicide and weapons-related charges, but not the endangering charge. Although defense counsel unsuccessfully moved to dismiss the endangering

charge pre-trial[4] and at the close of the State's case,[5] counsel never requested the self-defense charge as applied to endangering or objected to its omission. Because there was no objection in the trial court, defendant "waived the right to challenge the instruction on appeal," State v. Afanador, 151 N.J. 41, 54 (1997) (citing R. 1:7-2), and we therefore review for "plain error . . . ." Ibid. (citing R. 2:10-2); see State v. Nero, 195 N.J. 397, 407 (2008) ("explaining that '[a] claim of deficiency in a jury charge to which no objection is interposed "will not be considered unless it qualifies as plain error"'" (alteration in original) (quoting State v. R.B., 183 N.J. 308, 321-22 (2005))).

> Plain error, in the context of a jury charge, is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [Afanador, 151 N.J. at 54 (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).]

However, "[t]he mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). "Rather, '[t]he possibility must be

---

[4] Defendant challenged the endangering charge as unconstitutional on its face and as applied to defendant, arguing the statute did not apply in cases of self-defense.

[5] Defendant moved for a judgment of acquittal on the endangering charge pursuant to Rule 3:18-1, requiring acquittal "if the evidence is insufficient to warrant a conviction."

A-1965-18

real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Alexander, 233 N.J. 132, 142 (2018) (alteration in original) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Nevertheless, "we acknowledge that 'correct jury charges are especially critical in guiding deliberations in criminal matters, [and] improper instructions on material issues are presumed to constitute reversible error.'" Funderberg, 225 N.J. at 84 (alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)); see State v. Montalvo, 229 N.J. 300, 323 (2017) ("[B]ecause the erroneous [self-defense] instructions were capable of producing an unjust result in this matter, we hold that they constitute plain error."); see also State v. Gentry, 439 N.J. Super. 57, 67 (App. Div. 2015) ("Where there is sufficient evidence to warrant a self-defense charge, failure to instruct the jury that self-defense is a complete justification for manslaughter offenses as well as for murder constitutes plain error.").

The novel issue presented in this appeal is whether a claim of self-defense applies to a charge of endangering when the injured victim has been injured by the defendant in the course of defending himself against said victim. To provide context to our analysis, we review the general principles regarding justification defenses as well as the elements of endangering an injured victim.

"The New Jersey Code of Criminal Justice defines the manner and circumstances in which a person may use force to protect himself from harm." State v. Rodriguez, 195 N.J. 165, 171 (2008). Subsection (a) of N.J.S.A. 2C:3-4 provides that "the use of force upon or toward another person is justifiable when the actor reasonably believes such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." Subsection (b), in turn, provides "[l]imitations on justifying necessity for use of force," including limitations placed on "[t]he use of deadly force . . . ." N.J.S.A. 2C:3-4(b)(2). Under that subsection, "deadly force is not justifiable . . . unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm" or if "[t]he actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . ." N.J.S.A. 2C:3-4(b)(2)(b).

"While it is not requisite that actual necessity exist, the justification of self-defense requires an honest belief on the part of the defendant in the need to use force." State v. Bryant, 288 N.J. Super. 27, 34 (App. Div. 1996). "Honesty, alone, however, does not suffice. A defendant claiming the privilege of self-defense must also establish that his belief in the need to use force was reasonable." Ibid. "The reasonableness of the defendant's belief is to be determined by the jury using an objective standard of what a reasonable

A-1965-18

person would have done in defendant's position in light of the circumstances known to defendant at the time the force was used." Ibid.

The criminal offense of endangering as set forth in N.J.S.A. 2C:12-1.2(a) provides that

> [a] person is guilty of endangering an injured victim if he causes bodily injury to any person or solicits, aids, encourages, or attempts or agrees to aid another, who causes bodily injury to any person, and leaves the scene of the injury knowing or reasonably believing that the injured person is physically helpless, mentally incapacitated or otherwise unable to care for himself.

The statute defines "physically helpless" as "the condition in which a person is unconscious, unable to flee, or physically unable to summon assistance," and "bodily injury" as "set forth in N.J.S.A. 2C:11-1" which "means physical pain, illness or any impairment of physical condition . . . ." N.J.S.A. 2C:12-1.2(b); N.J.S.A. 2C:11-1(a).

Our Supreme Court has distilled the elements of the offense as follows:

> (1) that defendant knowingly caused bodily injury to any person; (2) that the injured person was physically helpless, mentally incapacitated, or otherwise unable to care for [him]self; and (3) that the defendant left the scene of the injury knowing or reasonably believing that the injured person was in that condition. We rely on the gap-filler provision at N.J.S.A. 2C:2-2(c) to add the mental state of "knowingly" to the first element.
>
> [State v. Munafo, 222 N.J. 480, 488-89 (2015).]

11

The Court further noted:

> [t]he statute also provides a defense: "It is an affirmative defense to prosecution for a violation of this section that the defendant summoned medical treatment for the victim or knew that medical treatment had been summoned by another person, and protected the victim from further injury or harm until emergency assistance personnel arrived." Defendant must prove the defense by a preponderance of the evidence.
>
> [Id. at 489 (quoting N.J.S.A. 2C:12-1.2(c)).]

Contrary to defendant's contention, the endangering statute does not require the use of unlawful force or the commission of a crime by the defendant for liability to attach. As the Munafo Court explained, all that is required is for the defendant "to cause bodily injury [and] flee the scene [with] knowledge or a reasonable belief that the injured person was in a vulnerable state." Id. at 492 (emphasis omitted). Thus, whether the use of force was lawful is irrelevant for purposes of the endangering statute. Moreover, the statutory requirement that the defendant leave the scene with the knowledge or reasonable belief that the injured person was physically helpless would appear to countermand the justification for using force when the defendant "reasonably believes that such force is necessary to protect himself against death or serious bodily harm . . . ." N.J.S.A. 2C:3-4(b)(2)(b).

A-1965-18

Because the plain language of the endangering statute does not resolve the question of whether self-defense applies, the issue becomes one of statutory interpretation.  In that regard, "[o]ur task . . . 'is to discern and give effect' to the Legislature's intent."  Id. at 488 (quoting State v. O'Driscoll, 215 N.J. 461, 474 (2013)).  While we begin by "look[ing] at the plain language of the statute," if "the language is unclear, courts can turn to extrinsic evidence for guidance, including a law's legislative history."  Ibid.

Turning to the legislative history, the bill that was eventually codified as N.J.S.A. 2C:12-1.2 began with different language.  It was first introduced in the Senate on September 24, 1998, and referred to the Senate Judiciary Committee as a bill that "[c]riminalizes the failure of a witness to report a crime in certain circumstances."  S. 1349 (1998).  That bill had initially provided, in its entirety:

> [a]ny person who knows that a crime is being committed and that the victim of that crime is exposed to bodily injury shall, to the extent that the person can do so without danger to himself or another person, report that crime to a law enforcement officer as soon as reasonably practicable.  Any person who violates this section is guilty of a crime of the fourth degree.
>
> [Ibid. (emphasis added).]

This early version of the bill bore strong similarities to laws in other states, sometimes referred to as "Samaritan" statutes.  See generally Ken

13

A-1965-18

Levy, Killing, Letting Die, and the Case for Mildly Punishing Bad Samaritanism, 44 Ga. L. Rev. 607, 611 (2010); Damien Schiff, Samaritans: Good, Bad and Ugly: A Comparative Law Analysis, 11 Roger Williams U. L. Rev. 77, 80 (2005). For example, Minnesota's and Rhode Island's statutes, each enacted prior to our state's endangering statute, respectively provided:

> [a] person at the scene of an emergency who knows that another person is exposed to or has suffered grave physical harm shall, to the extent that the person can do so without danger or peril to self or others, give reasonable assistance to the exposed person. Reasonable assistance may include obtaining or attempting to obtain aid from law enforcement or medical personnel. A person who violates this subdivision is guilty of a petty misdemeanor.
>
> [Minn. Stat. § 604A.01, subd. 1 (1995) (emphasis added).]

> A person who knows that another person is a victim of sexual assault, murder, manslaughter, or armed robbery and who is at the scene of the crime shall, to the extent that the person can do so without danger of peril to the person or others, report the crime to an appropriate law enforcement official as soon as reasonably practicable.
>
> [11 R.I. Gen. Laws § 11-1-5.1 (1987) (emphasis added).]

On June 7, 1999, the Senate Judiciary Committee "report[ed] favorably a committee substitute for Senate Bill No. 1349," albeit with different language. S. Judiciary Comm. Statement to S. Comm. Substitute for S. 1349 (June 7,

A-1965-18

1999).  Like the original, the new version of S. 1349 proscribed conduct when the actor knew the victim had sustained bodily injury and failed to assist the victim.  However, the new bill differed in several material respects.  S. Comm. Substitute for S. 1349 (June 7, 1999).  First, it elevated the offense from a crime of the fourth-degree to a crime of the third-degree; second, it added the element that the actor had caused, or aided the person who caused the victim's injury; third, it required the bodily injury be such that the victim was "physically helpless"; fourth, it proscribed leaving the scene of the injury; fifth, it eliminated the reference to reporting the offense to law enforcement and instead created an affirmative defense for "summon[ing] medical treatment"; and sixth, it eliminated the clause concerning whether the actor had the ability to report the injury "without danger to himself or another person." Ibid.

This new or second version of S. 1349 passed unanimously in the Senate on July 1, 1999, and was referred to the Assembly Judiciary Committee.[6]  In the next legislative session, on February 10, 2000, S. 1349, now renumbered as S. 968, was reintroduced to the new Senate with identical language as the

---

[6]  Passage of the Endangering Bill, New Jersey Legislature, https://njleg.state.nj.us/bills/bills0001.asp (follow "Prior Sessions" tab under bills; select "Bills 1998-1999"; follow "Bill Number" hyperlink; then search S1349; and then follow "S1349" hyperlink).

second version and an identical sponsor's statement. Introduction of S. 968 (Feb. 10, 2000). On June 22, 2000, in the first reprint of S. 968, the Senate Judiciary Committee added two provisions, each concerning whether the actor whose conduct was at issue was a "participant." First Reprint of S. 968 (June 22, 2000). The first amendment added to subsection (a) of the present version of the statute the following language, underlined here for ease of reference: "[a] person is guilty of endangering an injured victim if he causes bodily injury to any person or solicits, aids, encourages, or attempts or agrees to aid another, who causes bodily injury to any person, or is a participant and leaves the scene . . . ." Ibid. (emphasis added). The second amendment defined "participant" in the following manner: "'[p]articipant' shall include an individual who is present at the location of the crime, aware of the criminal activity, and has a nexus to any of the criminal actors." Ibid.

On September 21, 2000, that version of the bill was again amended on the floor of the Senate, with the "participant" references deleted entirely, restoring the text of the bill to the version of S. 968 originally introduced in February of 2000. Compare Introduction of S. 968 (Feb. 10, 2000) with Second Reprint of S. 968 (Feb. 10, 2000). The Sponsor's Statement to the final version of the bill explained:

> [b]y committee amendment, the word "participant"
> was added to the bill. The committee amendments

16

also added a definition of "participant." These floor amendments would delete that definition and the reference to "participant." The sponsor feels that these additions were unnecessary and could cause confusion for law enforcement agencies seeking to enforce the bill's provisions.

[Sponsor's Statement to First Reprint of S. 968 (Sept. 21, 2000).]

Considering this legislative record, courts have recognized that certain aspects of the statute's legislative history remain opaque. See State v. Moon, 396 N.J. Super. 109, 117 n.2 (App. Div. 2007) ("The legislative history [of N.J.S.A. 2C:12-1.2] is not informative."); see also Munafo, 222 N.J. at 491-92. Although the original version of the bill bears strong similarities to statutes in other states, including Minnesota and Rhode Island, the version of the bill that emerged from the Senate Judiciary Committee and became law differs significantly from those state statutes and appears to be unique.

Indeed, "[e]ndangering an injured victim" has no analog in the American Law Institute's Model Penal Code. See generally Model Penal Code (Am. Law Inst. 1962). The commentary in New Jersey Criminal Code Annotated on N.J.S.A. 2C:12-1.2 infers that the statute "seems to have been suggested by 2C:12-1.1," the statute criminalizing knowingly leaving the scene of a motor vehicle accident, though the commentary acknowledges that the two statutes, enacted three years apart, contain significantly different elements. Cannel,

17

New Jersey Criminal Code Annotated, cmt. 1 on N.J.S.A. 2C:12-1.2 (2020). Among other things, N.J.S.A. 2C:12-1.1 does not require that the victim be physically helpless, that the actor have knowledge of the victim's condition, nor that the actor knowingly cause the injury. Compare N.J.S.A. 2C:12-1.1 with N.J.S.A. 2C:12-1.2.

Given the lack of clarity regarding the origin of the language in the final version of the endangering statute, we may consider newspaper articles as relevant in ascertaining legislative intent where the materials "provide a contemporaneous commentary on the origins of the act and its passage through the Legislature." Raybestos-Manhattan, Inc. v. Glaser, 144 N.J. Super. 152, 168 (Ch. Div. 1976), aff'd, 156 N.J. Super. 513 (App. Div. 1978); see also BASF Corp. Coating & Ink Div. v. Town of Belvidere, 22 N.J. Tax 550, 563 (2005), aff'd, 24 N.J. Tax 416 (App. Div. 2009) (finding that consideration of a newspaper article is appropriate where "more traditional legislative history, such as committee statements, is not helpful in interpreting a statute").

Here, contemporaneous newspaper articles provide some insight into the Legislature's intent in crafting this statute. An article published in the Star-Ledger, about one month after the original version of S. 1349 was introduced, reported that the sponsors' purpose in introducing the bill was "to target what [the sponsors] describe[d] as 'passive participants,' those who do nothing as

18

companions commit assault, robbery or other offenses." Tom Haydon, <u>Victim Seeks a Law on 'Passive' Crooks</u>, The Star Ledger, Oct. 27, 1998, at 19. As reported in the article, this legislative action was in response to a campaign by the victim of a carjacking and assault, "pleading" to elected officials "for a law to punish spectators to violent crime who fail to intervene." <u>Ibid.</u> In the assault that spurred the crime victim's letter writing campaign, three of the five suspects had waited passively in the car while two other suspects violently assaulted her. <u>Ibid.</u> In another article, one of the sponsors reportedly explained that the senators' intention was not to target "innocent bystanders" but people in the position of the "passive participants" who, "[b]y their mere presence . . . gave approval to what was going on" and "could have done something to prevent this, like getting out of the car and saying, 'Stop hitting her with a bat!'" Rudy Larini, <u>Jersey Looking to Prosecute Passivity</u>, The Star-Ledger, Oct. 19, 1998, at 13.

From this legislative history, supplemented by contemporaneous newspaper articles, it is clear the Legislature began with a bill that was similar to the Samaritan statutes in Minnesota and Rhode Island, which had specifically exempted from liability a person who could not safely assist an injured victim "without danger to himself or another person." <u>S. 1349</u> (1998).

A-1965-18

However, that provision was deleted in the final version of the bill as was any reference to the commission of a "crime." S. 968 (2000).

Thus, an interpretation of the endangering statute that allows self-protection as a defense to liability is not supported by the legislative history. Instead, liability under the statute appears to encompass a participant in the events causing the victim's injury, irrespective of whether the participant reasonably believes the injury-causing force was necessary for self-protection or the protection of others. In that vein, leaving the scene without summoning medical assistance for a subdued and injured attacker does not appear to extend beyond the reach of the endangering statute.

Whether or not self-defense applies to the endangering statute under any circumstances, we are satisfied that its omission in the unique facts presented in this case does not rise to the level of plain error. Here, when defendant walked away, it was clear that his conduct had rendered Anthony physically helpless such that he no longer posed a threat to defendant or anyone else. Indeed, the jury's determination that Anthony was "physically helpless" as evidenced by the verdict obviates a finding that defendant could have had a reasonable belief in the need to use force or no ability to safely retreat to justify self-defense. See State v. O'Neil, 219 N.J. 598, 613 (2014) ("[T]he use of deadly force is justifiable provided that . . . the defendant 'reasonably

20

believe[d] that such force is necessary to protect himself against death or serious bodily harm,' . . . and . . . he does not have the ability to safely retreat." (quoting Rodriguez, 195 N.J. at 171)).

Arguably, other circumstances not present here, such as Anthony continuing to pose a threat after he had been stabbed by defendant, are addressed by other defenses, like the defense of necessity. Similar to "use of force," necessity, also referred to as the "choice of evils" defense, State v. Tate, 102 N.J. 64, 73 (1986), is a justification included in the third chapter of the Code, and provides:

> [c]onduct which would otherwise be an offense is justifiable by reason of necessity to the extent permitted by law and as to which neither the code nor other statutory law defining the offense provides exceptions or defenses dealing with the specific situation involved and a legislative purpose to exclude the justification claimed does not otherwise plainly appear.
>
> [N.J.S.A. 2C:3-2(a).]

There is no plain legislative purpose to exclude the necessity defense as a defense to endangering.

Similarly, had Anthony continued to pose a threat after the stabbing, defendant's conduct in "leav[ing] the scene" without summoning medical assistance could have arguably been consonant with his legal duty to retreat in lieu of continuing to use deadly force. See N.J.S.A. 2C:3-4(b)(2)(b) (requiring

21

"avoid[ing] the necessity of using force . . . by retreating"); see also Rodriguez, 195 N.J. at 174-75 (noting that the question of whether a defendant "knew that he could have avoided the use of deadly force by safely retreating" was a jury question).  In that sense, retreating by leaving would not only have been "permitted," but required by law.

Defendant argues anecdotally that "[i]t would be absurd for a person, after acting justifiably in self-defense, to have to stay and check if his attacker was 'physically helpless.'"  While the argument is appealing, it presumes facts not in evidence.  Here, after defendant stabbed Anthony in the chest, both parties immediately stopped fighting as Anthony, realizing that he had been stabbed, stumbled around before collapsing to the ground.  As defendant watched Anthony bleed profusely from the stab wound, stumble, and collapse to the ground, he backed away, eventually walking home without any attempt to summon medical assistance.  Rather than imposing an obligation on defendant to secure the safety of his attacker while endangering himself, the application of the endangering statute in this case sought to preserve a life after the threat or need for force had been neutralized.  Thus, self-defense does not apply to these circumstances.  Because of our decision, we need not address defendant's remaining arguments.

A-1965-18

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

_____

**SABATINO, P.J.A.D., concurring**.

I join in Judge Gooden Brown's scholarly opinion and its application of N.J.S.A. 2C:12-1.2(a) (third-degree endangering an injured victim) to the specific facts of this case. I write to punctuate some concerns about that statute's imposition of a duty to render aid, when applied in certain domestic violence or sexual assault scenarios, or other situations where well-established countervailing legal concepts may rightly come into play.

More specifically, I wish to underscore our unanimous recognition that concepts of self-defense, necessity, or other principles of legal justification may appropriately pertain in some factual settings to relieve a crime victim, who has repelled and injured an attacker, of criminal liability under N.J.S.A. 2C:12-1.2(a) for failing to render aid to that wounded attacker.

A few illustrations might be instructive. Consider, for instance, a situation in which A and B are together on the first floor of A's home. Without provocation, A begins to punch B repeatedly. B tries to resist A, but A continues to pummel B. B manages to pull away momentarily and shoves A. A falls backwards down a flight of stairs, with A's head striking the basement floor below. Dazed and bleeding, A appears to B from the top of the stairs to be at least temporarily subdued. Worried that A might recover and resume the attack, B does not run down to the basement to check on A's vitals and instead

flees immediately from the premises. Fearful that A might recover and retaliate against B for calling the police, B does not call for emergency aid.

Under a literal reading of N.J.S.A. 2C:12-1.2(a), B could be charged with the crime of third-degree endangering if B reasonably believed, after pushing A down the stairs, that A was "physically helpless, mentally incapacitated or otherwise unable to care for himself [or herself]." Such a prosecution would run counter to principles of self-defense and a would-be victim's associated obligation to engage in a "safe retreat" instead of using or resuming the use of lethal force to repel an attacker. See N.J.S.A. 2C:3-4(b)(2)(b); Restatement (Second) of Torts, § 65 (1965). In addition, B's decision to not call 9-1-1 and thereby risk being harmed by A at a later time in retaliation might arguably be consistent with the public policies underlying the protection and safety of victims of domestic violence. See generally N.J.S.A. 2C:25-18 (expressing legislative findings to protect the safety and welfare of domestic violence victims); State v. Kelly, 97 N.J. 178, 191-200 (1984) (discussing the application of self-defense principles to battered victims of domestic violence).

As a second illustration, imagine that C, a stranger, suddenly accosts D on a sidewalk at night, brandishes a knife and pulls D into a dark alleyway, and begins to sexually assault D. D grabs the knife away from C and plunges

2

it into C's neck. C staggers to the pavement and utters, "I'm gonna get you for this!" Traumatized, D runs away for safety. Assume that D reasonably does not report the episode to the police, in order to maintain anonymity. D's conduct is arguably a logical follow-through of the reasonable use of force to repel an attacker in self-defense. Even if C may appear to be mortally wounded, D may be justified in not remaining at the scene or summoning medical treatment under a reasonable belief that such a call somehow might be traced to D's cell phone and deprive D of anonymity.

Neither of these hypothetical situations are comparable to the facts of this case that are detailed in the majority opinion and soundly analyzed. Nor, apart from the literal wording of N.J.S.A. 2C:12-1.2, does it appear that the Legislature would want persons such as B and D punished as criminals for not calling 9-1-1.

These scenarios illustrate that we should be cautious in adopting an over-expansive reading of N.J.S.A. 2C:12-1.2. Although the statute is aimed at laudable humanitarian objectives, it must be construed and applied sensibly within the broad context of general principles of legal responsibility and criminal justice.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1965-18